(January 2, 1909.)

# STATE, Respondent, v. L. CHURCHILL, Appellant.

### [98 Pac. 853.]

MALICIOUS MISCHIEF—MALICIOUS KILLING AND MAIMING DOGS—CRIMINAL INTENT—TRESPASSING DOGS.

1. In a prosecution under sec. 7153, Rev. Stat., for the malicious killing, maiming or wounding of a dog, malice is the gist of the action, and must be established to the satisfaction of the jury beyond a reasonable doubt, in order to justify a conviction.

2. In a prosecution for maliciously killing, wounding or maiming dogs, the state must either show that the defendant entertained malice against the owner of the dogs, or that the killing, wounding or maiming was characterized by such wanton and reckless disregard of the rights of property in others as to raise the presumption of malice from the manner of the commission of the act.

3. Where trespassing dogs are chasing, worrying and frightening hogs and cattle, the owner of the premises in attempting to remove and eject the dogs therefrom has a right to act upon appearances. In other words, if there is apparent impending danger to his livestock, he is justified in the use of such force in ejecting the dogs as a reasonably prudent man would use under like circumstances in defense and protection of his property.

4. ID.—In such case the evidence of experts as to the habits and traits of the particular breed of dogs to the effect that they would not in fact harm or injure domestic animals is inadmissible, where the evidence as to the occurrence is direct and not circumstantial, unless it appear that the defendant at the time had knowledge of such habits and traits.

5. The rule applicable in civil actions for damages, allowing the introduction of evidence showing the pedigree, traits, habits and reputation of the particular dog killed, is not applicable in a criminal prosecution for maliciously killing dogs, unless knowledge of such facts is brought home to the defendant.

6. Even where defendant had knowledge of the traits and habits of the particular breed of dogs, and that such dog would not in fact kill or maim a domestic animal, if in fact the dog was at the time harassing, worrying and annoying gravid animals in such a manner as would likely cause his pecuniary loss, he will be justified in using such force as is necessary to eject the dogs from the premises and cause a cessation of the injuries.

7. Where it clearly appears that the defendant was not acquainted with the owner of the dogs, and did not in fact know who was

their owner, and in wounding and killing the dogs was not actuated by malice or a wanton or reckless spirit, but acted solely through a desire to remove the dogs from his premises, and to prevent their worrying, annoying and terrorizing his livestock, he cannot be held criminally liable for malicious mischief.

(Syllabus by the court.)

APPEAL from the District Court of the Seventh Judicial District, for the County of Washington. Hon. Ed. L. Bryan, Judge.

Prosecution for malicious mischief in killing, wounding and maiming dogs. From a judgment of conviction and an order denying a motion for a new trial, defendant appeals. *Reversed.*

Lot L. Feltham, and B. S. Varian, for Appellant.

The distinction between trespass and malicious trespass must be carefully maintained, or else an act done in defense of person or property upon serious provocation may nevertheless amount to a criminal offense. Such is not the intent of the statute, and hence a prosecution must fail where the proof fails to show malice toward the owner of the property. Therefore, a justification which shows a want of malice excuses the act committed, in so far as criminality is concerned. (*First Nat. Bank v. Burkett*, 101 Ill. 391, 40 Am. Rep. 209; 2 Wharton's Crim. Law, sec. 1068; *Gaskill v. State*, 56 Ind. 550; *Northcot v. State*, 43 Ala. 330; *Hobson v. State*, 44 Ala. 380; *Wright v. State*, 30 Ga. 327, 76 Am. Dec. 656; *Commonwealth v. Shafer*, 32 Pa. Super. Ct. 375; *Duncan v. State*, 49 Miss. 331.) Evidence of justification upon a charge of malicious mischief is, as a natural result of the rule requiring the existence of malice, a sufficient defense upon the trial, as tending to disprove the criminal intent. It is proper, therefore, for the accused to show, that at the time of the commission of the act he stood in fear and apprehension of impending injury to his own property, and that the act charged was reasonably necessary to prevent or avert such injury. (*State v. Robinson*, 3 Dev. & B. 130, 32 Am. Dec. 669, note; *Wright v. State*,

*supra; State v. Graham,* 46 Mo. 490; Bishop on Statutory
Crimes, secs. 436, 437.)

Dogs chasing animals can be killed. (*Anderson v. Smith,*
7 Ill. App. 354; *Barrett v. Utley,* 12 Bush, 399; *Leonard v.
Wilkins,* 9 Johns. 235; *Boecher v. Lutz,* 13 Daly, 28; *Woolf v.
Chalker,* 31 Conn. 121, 81 Am. Dec. 175; *State v. Marshall,*
13 Tex. 55; *Patten v. State,* 93 Ga. 111, 19 S. E. 734, 24 L.
R. A. 732; *Davis v. Commonwealth,* 17 Gratt. 617; *State v.
Mease,* 69 Mo. App. 581; *State v. Giles,* 125 Ind. 124, 25 N. E.
159.)

Malice against the owner or possessor of the property in-
jured or destroyed must be shown, and proof of malice toward
the property itself or toward any other person is not sufficient.
(1 Am. & Eng. Ann. Cas., p. 494, note, and cases cited; *Com-
monwealth v. Shafer,* 32 Pa. Super. Ct. 375.)   The question
of justification would be an issue in an action for damages
against defendant, but on this complaint the issue was malice
or no malice.   If he shot from the motive of protecting his
stock, and not from either ill-will to the owner or cruelty to
the animals, his motive was not malicious, whether it was justi-
fied or not, and his act was not malicious mischief. (*Wright
v. State,* 30 Ga. 325, 76 Am. Dec. 656; *Thomas v. State,* 30
Ark. 433; *State v. Willcox,* 3 Yerg. (Tenn.), 278, 24 Am. Dec.
569.)   In a prosecution for malicious mischief, malice toward
the owner of the property injured must be averred and found.
It will not be inferred from a merely injurious act, such as kill-
ing the animal of another. (*State v. Newby,* 64 N. C. 23.)

J. J. Guheen, Attorney General, and B. S. Crow, for Re-
spondent.

The construction to be placed on "malicious," as used in
our statutes, is not a feeling of ill-will toward any particular
person, but "an intent to do a wrongful act, established either
by proof or presumption of law."   Such statutes are enacted
with the object of denouncing and punishing certain injuries
to *property* unlawfully, intentionally or wantonly done, and it
is of no importance whether or not the offender knew who was
the owner of the property destroyed. (*Territory v. Crozier,*

6 Dak. 8, 50 N. W. 124; *State v. Coleman,* 29 Utah, 417, 82 Pac. 465; *Roe v. State,* 82 Ala. 68, 3 South. 2; *Mosely v. State,* 28 Ga. 190; *State v. Hambleton,* 22 Mo. 452; *Brown v. State,* 26 Ohio St. 176; *State v. Toney,* 15 S. C. 409; *Manes v. State,* 20 Tex. 38; *State v. Roscum,* 128 Iowa, 509, 104 N. W. 800; *State v. Dowdell,* 106 La. 645, 31 South. 151; *Funderburk v. State,* 75 Miss. 20, 21 South. 658; *State v. Gilligan,* 23 R. I. 400, 50 Atl. 844; *Ex parte Mauch,* 134 Cal. 500, 66 Pac. 734.) The malice is inferred from the act itself, and the manner of committing it. (*People v. Burkhardt,* 72 Mich. 172, 40 N. W. 240; *People v. Petherman,* 64 Mich. 252, 31 N. W. 188; *Wallace v. State,* 30 Tex. 758.)

The mere fact that animals are trespassers gives no right to the land owner to injure or destroy them. (*Snap v. People,* 19 Ill. 80, 68 Am. Dec. 582; *State v. Rivers,* 90 N. C. 738; *Sosat v. State,* 2 Ind. App. 586, 28 N. E. 1017; *McChesney v. Wilson,* 132 Mich. 252, 93 N. W. 627; *Brookerson v. State,* 49 Tex. Cr. 421, 93 S. W. 725.) The *reasonable necessity* for killing a trespassing dog is a question for the jury under all the facts and circumstances of the case. (*Hodges v. Causey,* 77 Miss. 353, 78 Am. St. Rep. 525, 26 South. 945, 48 L. R. A. 95.)

The testimony as to the character and habits of the hounds is proper testimony to go before a jury, and was entitled to whatever weight the jury desired to give to it, as rebutting defendant's testimony. (1 Wigmore, Ev., sec. 68; 1 Jones, Ev., sec. 162.)

AILSHIE, C. J.—The defendant was prosecuted on the charge of malicious mischief for shooting, maiming and killing dogs belonging to one John A. Kelly, the complaining witness. The jury returned a verdict against the defendant and he was thereupon sentenced to pay a fine. He moved for a new trial and his motion was denied, and he thereupon appealed from the judgment and order denying his motion. This prosecution is founded on sec. 7153, Rev. Stat., which is as follows:

"Every person who maliciously kills, maims or wounds any animal, the property of another, or who maliciously and cruelly

beats, tortures or injures any animal, whether belonging to himself or another, is guilty of a misdemeanor.''

The chief contention urged is that the evidence wholly fails to establish malice. In the consideration of both the facts and the law in the case, it should be borne in mind that this is a criminal prosecution, and not a civil action for damages, and what may hereafter be said in this opinion will be with special reference to the status of the defendant in his conduct toward the dogs as viewed by the criminal law.

It appears that on January 12, 1908, the complaining witness, Kelly, started out with a pack of thirteen hounds to hunt coyotes. The defendant, his wife and two hired men testified that sometime before noon that day a number of these hounds came on to his place and ran through his corral and barn lot, apparently chasing after his cattle and hogs, and frightening the cows and likewise the hogs; that defendant chased the dogs away several times with sticks and stones. In the afternoon they appeared on several occasions, running through the corral and barn lot and apparently after the cows and hogs, bawling and yelping as they ran. The defendant, who was at work on a building near the barn, got down from his work several times and drove the dogs away, and finally, when they were chasing some of his hogs, he got his gun and took several shots at the dogs, killing one and wounding others. Two of the dogs that were wounded were produced in court, and the defendant, his wife and the two hired men testified that to the best of their knowledge these were the same dogs that were on defendant's ranch at several different times on the 12th day of January, the day on which the shooting occurred.

The defendant owned a farm of some 300 acres, and was engaged chiefly in the dairy business. He also had a number of hogs and other livestock on the place. The leading facts in the occurrence are covered by the defendant's evidence, which is substantially corroborated by that of his wife and hired men. It is as follows:

''Our cows were in there, and as many of them were heavy with calf, I had been watching them very carefully. When the dogs ran in there barking, I got down and ran there as quick as I could. At that time they had the cattle bawling

and chasing around and I went after the dogs with anything I could pick up—sticks and stones—and chased the dogs, who were following the cattle down this path going to the river. I chased the dogs down that way and they would run and look back to see what I was throwing, and dodging. I followed the dogs down this way and took a circle around this brush. I must have been gone a half hour. I was looking for a man with a gun going with the dogs and I could not find anyone on the place, and I went back and went to work again. . . . . Not only would the dogs run through the corral and chase things around, but they chased the calves and pigs in those yards here, and had nearly everything on the place stampeded. I drove these dogs out this way and down that way just as quick as I could each time. The dogs were chasing cows. They appeared to be chasing them. They would run this way and that way. At the time they went in the corral, I had no idea they were on any scent. They weren't running in a bunch. Each dog was chasing something individually. The only time I saw the dogs together trailing each other in a bunch, or approaching that, was in the morning when I saw the four. In the evening I saw four dogs out here in one bunch and I saw three in this corral around the barn. I never saw more than four dogs together that day in one bunch. I began to be pretty well annoyed late in the afternoon. I thought I had had enough of it. About 5 o'clock, just before we were to do our chores, some dogs ran into the corral in this direction and began to chase the calves and pigs here and I just ran into the house and picked up a gun, a small 22-caliber rifle. I have no other gun on the place. I picked up a few 22 cartridges—smokeless cartridges—and I ran out here to this point (indicating), and ran to the barn where the dogs were chasing the pigs (indicating), right in there, and I intended to shoot them right here. I could not get rid of them any other way. I had stoned and sticked them all day, but there were so many animals there I did not dare to shoot them. I chased them down in this direction and they got into the brush before I got a shot at them. I came back up here between the haystack and the barn. My wife was standing over here somewhere and she called to me that the dogs were out in front of

the house chasing the pigs, so I went out in that direction as fast as I could. I ran past the corner of the milk-house and almost on a line with the corner of that fence just about in that direction (indicating south). That is just about as near my direction as I can point it. I came out at a point just here and here is where I took a shot at the dogs. At the time I went out there there were four dogs chasing the pigs. Each dog was chasing a bunch of pigs. Some of these pigs were brood sows and I went out there to stop it. Two bunches of pigs were driven off in this direction (indicating), and one bunch was driven over to this fence and they went through the fence into my neighbor's field. This was at the time I shot the dogs. I shot them while they were in the act of chasing the pigs. At that time on the ranch I had eight head of horses, about 50 cattle stock, a flock of chickens, a flock of pigeons and over a hundred hogs of different sizes. I have mostly Jersey cattle on the ranch, 31 head, and am trying to dispose of everything else. On the ranch that day there were 8 or 9 cows that were expected to calve very soon. One cow dropped her calf within 24 hours from the time I shot at the dogs. That was Monday. On Tuesday another cow dropped her calf and on the following Monday we had another Hereford calf and the Tuesday following another, and on the 28th of January another, making five that have dropped their calves since the shooting. All were milch cows that were on the place. At that time we milked ten head. The drove of hogs consisted of 8 brood sows, 1 boar, and the balance of the 100 were fair-sized pigs 3 months old up to pigs that weighed 150 to 200 pounds. One of the sows had farrowed three days before the shooting and the others were heavy with pig. Since the shooting four of the sows have aborted—that is, produced their pigs prematurely. The pigs didn't live. . . . . Twenty-four pigs died. My object in shooting at the dogs that day was to protect my stock and prevent the dogs from doing it any injury. At the time of the shooting I did not know to whom these dogs belonged. During the day no man appeared on the ranch to look after the dogs or to take care of them.''

The state, on rebuttal, produced witnesses who testified that these hounds were at other places at or near the times when

defendant says they were on his ranch, and that they could not therefore have been on his place as frequently that day as he and his witnesses claim. This evidence had a tendency to establish an alibi for the dogs for a part of the day, but does not take into consideration the capacity of the dogs for rapid transit between the *locus* of the alibi and the defendant's ranch. It is admitted that the dogs were there in the afternoon. The state also attempted to rebut and contradict the evidence of defendant and his witnesses by producing experts on the pedigree, traits, habits and instincts of the dogs, and especially of English foxhounds such as these were shown to be. It appears that they were full-blood English foxhounds, bred in Missouri and brought from thence to Idaho, and the older ones are referred to by the prosecutor as Missouri hounds. These experts on dog lore testified that such hounds as these would neither chase nor harm domestic animals, and that they would pay no attention to them. They also testified to a personal acquaintance with and observation of these hounds, and that they would not, and could not, be induced to chase or disturb cattle or hogs. Where the evidence was direct from four eye-witnesses, as was the case here, proof of traits, habits and reputation, or, as commonly designated, character evidence, would not contradict the eye-witnesses, and had no real bearing on the case. The transaction was not established by circumstantial evidence, but by eye-witnesses. Under the rule applicable in cases of homicide, the good reputation of the deceased may not be shown by the state until it is attacked by the defendant. Here the character, or rather the reputation, of the deceased dog was not attacked by the defendant, but only his positive acts and conduct were shown by defendant. This evidence could throw no light on the issue unless it was shown that the defendant knew these traits of the dogs in question. On the contrary, it appears from his own testimony, and otherwise, that he knew nothing about the traits, habits or instincts of English foxhounds or dogs of the chase. In the absence of such knowledge in advance he had a right to act on appearances. In other words, defendant contends that there was apparent impending danger to his livestock such as a reasonable man would resist. (*Mar-*

*shall v. Blackshire,* 44 Iowa, 475; *Livermore v. Batchelder,* 141 Mass. 179, 5 N. E. 275.) The question that confronted defendant was not what the dogs really meant to do (in the absence of positive information to that effect), but what they *were doing* or *apparently intended to do.* As said by the supreme court of New Hampshire in *Aldrich v. Wright,* 53 N. H. 398, 16 Am. Rep. 339, a leading case on the right of defense of property as against the assaults of animals: "He [the defendant] might have entertained, and had good cause to entertain erroneous ideas of the character of the animals. . . . . The evidence against them tended to show what, in a human creature, would be the ordinary symptoms of a felonious spirit regardless of social duty and fatally bent on mischief." And again, the same court, in considering the question as to whether the defendant was in fact acquainted with or informed as to the habits of certain animals, held that he was not chargeable with such knowledge, and said: "It was not his duty to postpone the defense of his property until, neglecting his usual occupation and incurring expense, he could examine zoological authorities, consult experts, and take the opinion of the county on the question whether his 'half-grown' geese were actually endangered in life or limb," etc. The law does not require the farmer who engages in raising livestock to first familiarize himself with the traits and habits of all the breeds of dogs that may infest the country—he may not know the difference between a tramp dog or common cur and a blooded English foxhound with a pedigree antedating the landing of the Mayflower; he may not know, in fact, that the foxhound, when he gallops and cakewalks up and down the barn lot to the great confusion and consternation of the cattle, hogs and fowls, is merely following the trail of a hungry coyote that had been pilfering the night before, bent on murder and theft; but, on the contrary, he may honestly assume that the hound, himself a trespasser, is bent on mischief, and if he does not retreat when warned, may at once become liable to forcible ejection. In such case the farmer cannot risk the dangers to his livestock while he investigates the dog's pedigree, and even if he were advised of that, how can he know at what moment the vicious traits of the dog's

remote wolf and jackal ancestors may get the better of his breeding and social training and run riot in that same barnyard? (*Sentell v. New Orleans etc. Co.,* 106 U. S. 698, 17 Sup. Ct. 693, 41 L. ed. 1169.) Even if it were a fact that defendant knew the traits and habits of the hounds and their alleged kindly and amiable disposition toward his cows and hogs, he had no way of imparting that knowledge to his frightened animals, neither did the cows and hogs have any notice that the hounds, though bawling, yelping and baying, would not bite, maim or kill them; they were not informed as to the hounds' pedigree. They, too, were acting on appearances and the instinct of self-protection. The result was that the animals became alarmed and frightened, and, as a consequence, defendant thereafter suffered a direct pecuniary loss to the extent of twenty-four prematurely born pigs and ten per cent falling off in the production of milk.

Here the defendant's cows and hogs were in their owner's field—a place where they had a lawful right to be. The hounds were trespassers, in the first place. After they had been warned away and sticks and stones had been thrown at them, they became forcible trespassers—trespassers *vi et armis,* as it were. The assault made by the trespassers upon defendant's cows and hogs was one of apparent danger and peril. So imminent was the peril that the hogs not only retreated, but broke the fence and became themselves kind of involuntary trespassers in the field of defendant's neighbor. The cows in their alarm retreated to the wall and there gave the sign of distress and sounded the bovine call for help. Now, the question arises: Was it *per se* malicious for defendant, under these circumstances, to come to the defense of his property and in ejecting the trespassing canines to shoot them? The farmer is not required to fence against dogs. The dogs were unaccompanied by their master, and were undoubtedly running back and forth among defendant's cattle and swine. They were either chasing defendant's livestock or following the scent of a wild animal, neither of which their master owned. If they were only following the trail of a wild animal across the field and through the barnyard, and the defendant had been apprised of that fact and that their

intentions toward his kine and swine were honorable and well-disposed as would become English foxhounds born and bred in Missouri, then he would perhaps not have been justified in making a deadly assault on them. Of these things, however, he had no notice—besides he was justified in considering the effect the conduct of the trespassers was having on his cows and hogs, and especially on his gravid animals. He was not obliged to wait until the injury was done and rely on an action for damages to recompense him.

The law of trespass is that the injured party shall gently lay hands on the trespasser (*manus molliter imposuit*) and warn him to move on before further force can be used. In this case the defendant for obvious reasons could not lay hands on the hounds, but he warned them with sticks and stones, but to this they gave no heed. It then became a question with the owner of the premises as to whether the trespassers should be ejected or allowed to scare, frighten and terrorize defendant's livestock off the ranch. For similar reasons he could not distrain or impound the hounds.

This is a prosecution where criminal intent is the gist of the action and must be shown (sec. 7153 and subd. 4, sec. 6301, Rev. Stat.; 19 Am. & Eng. Ency. 641; 2 Cyc. 428), and differs materially from a civil action for damages for the killing or maiming of such animals. In an action for damages, evidence of the pedigree, habits, traits and reputation of the dog is important in determining his value to his owner. The admission of this class of evidence was considered by Mr. Justice Wilkes in the case of *Citizens' Rapid Transit Co. v. Dew,* 100 Tenn. 317, 66 Am. St. Rep. 754, 45 S. W. 790, 40 L. R. A. 518, and approved, and it was said that "there are high and low degrees among dogs as well as among men," and that the dog there involved stood high in "dog circles" and properly belonged to the "blue blood and inner circles of the four-hundred" of Tennessee. The ruling of the court in admitting the evidence in that case was sustained on the ground that it was proper in estimating the value of the dog.

There is a great diversity of opinion among the courts in actions for damages as to the circumstances and conditions under which a trespassing dog may be killed. It was aptly

remarked by Justice Wilkes in *Rapid Transit Co. v. Dew, supra,* that " 'dog law' is as hard to define as 'dog latin.' " (See 2 Cyc. 427.)

Some courts, out of an abundant admiration for the dog, have descanted on his fidelity and good qualities from the spaniel that saved the life of William of Orange (*Mullaly v. People,* 86 N. Y. 365) to the tramp cur "Roger," eulogized in "The Vagabonds," and in so doing they have generally overlooked the rights of property owners who were subjected to the dog's trespasses. For interesting discussions and notes, see *Fink v. Evans,* 95 Tenn. 413, 32 S. W. 307; *Hamby v. Samson,* 105 Iowa, 112, 67 Am. St. Rep. 285, 74 N. W. 918, 40 L. R. A. 508; *McChesney v. Wilson,* 132 Mich. 252, 93 N. W. 627; *Patton v. State,* 93 Ga. 111, 19 S. E. 734, 24 L. R. A. 732.

From what has been said, it clearly appears that whether or not the defendant could, in a civil action for damages, justify the use of force to the extent and degree it was exercised by him in ejecting the dogs, nevertheless, his action and conduct was in no manner prompted by malice toward the owner of these hounds, nor was it characterized by a wanton and reckless disregard of the rights of property in such animals. The defendant evidently used violence on the dogs through a desire and for the unmistakable purpose of removing them from his premises and preventing them from annoying and disturbing his livestock. Whether he clearly and accurately measured the force he was using sufficiently to justify him in the eye of the civil law, is beside the question here. That he did not act with criminal and malicious intent to wantonly and recklessly destroy the property of another is too clear and apparent to leave any question for submission to a jury on that score. "Malicious;" as used in the statute under which this prosecution is had, is not equivalent to the word "wrongful" as used in the law of torts. The former word means more than the latter. It necessarily involves crime, while the latter does not necessarily do so. (*Chappell v. State,* 35 Ark. 345; *State v. Hussey,* 60 Me. 410, 11 Am. Rep. 209; 2 Wharton's Criminal Law, secs. 1068-1070; *State v. Phipps,* 95 Iowa, 491, 64 N. W. 411; *United States v. Gideon,* 1 Minn.

(292) 226; *State v. Rector*, 34 Tex. 565; note to *State v. Robinson*, 3 Dev. & B. 130, 32 Am. Dec. 661; 19 Am. & Eng. Ency. 643.)

The evidence is not sufficient to support the verdict. Instead of establishing malice on the part of the defendant, the evidence negatives malice. However liable a man may be in damages for injury to or destruction of trespassing dogs, it will not do to say that he can be brought to the bar of the criminal courts every time he protects his property against the depredations and annoyances of dogs, whether they be patrician or plebian dogs.

The judgment is reversed and a new trial granted.

Sullivan, J., concurs.

Stewart, J., concurs in the conclusion reached.