IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 41394-2013

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | Boise, May 2014 Term |
| Plaintiff-Respondent, | ) | |
| | ) | 2014 Opinion No. 94 |
| v. | ) | |
| | ) | Filed: September 15, 2014 |
| JAMES LEROY SKUNKCAP, | ) | |
| | ) | Stephen W. Kenyon, Clerk |
| Defendant-Appellant. | ) | |
| | ) | SUBSTITUTE OPINION, THE |
| | ) | COURT'S PRIOR OPINION |
| | ) | DATED JUNE 17, 2014 IS |
| | ) | HEREBY WITHDRAWN. |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, in and for Bannock County. The Hon. Peter D. McDermott and the Hon. Robert C. Naftz, District Judges.

The judgments of the district court are affirmed.

Sarah E. Tompkins, Deputy State Appellate Public Defender, Boise, argued for appellant.

Kenneth K. Jorgensen, Deputy Attorney General, Boise, argued for respondent.

_____

EISMANN, Justice.

These are two cases out of Bannock County that were consolidated on appeal. In the first case, the Defendant was convicted of attempting to elude a peace officer, a felony, and of malicious injury to property and assault, both misdemeanors. In the second case, the Defendant was convicted of grand theft, a felony. For each felony, he was sentenced to eighteen years in prison, with eight years fixed and ten years indeterminate, and the sentences were ordered to be served consecutively. We affirm the convictions and sentences.

**I.**
**Factual Background.**

**November 13, 2006, crime.** On November 13, 2006, James Leroy Skunkcap (Defendant) stole two saddles from a horse trailer that the owner of a store had parked next to a warehouse that was located near the store. As one is facing the front of the store, the warehouse would be to the left of and behind the store, and the horse trailer was parked near the left side of the warehouse. At about 1:15 p.m., a store employee, who was feeling ill, left the store to drive home. She left by the front door and was walking to her pickup, which was parked to the left of the store. While doing so, she saw a light blue car parked beside the left side of the horse trailer. The front of the car and the front of the trailer were facing her. She could see that the trunk of the car was open and there was a man standing behind the car. After she got into her pickup, which she estimated to be sixty to seventy feet from the blue car, she could see that the man was struggling to put a saddle into the trunk of the car, and she saw that the back door of the trailer was open. She thought that if the man had purchased or pawned the saddle, it would be strange to park so far from the store's front door. She watched the man for about five minutes and wrote down the license number of the car. After he drove away, she headed home, but as she was doing so she telephoned the store and spoke to two employees to see if anyone had done any transaction with a saddle. She also suggested that the owner check his horse trailer.

It normally took the employee about thirty minutes to drive from the store to her home. Before she arrived at home, she received a telephone call from a police officer, and she told him the license number of the blue car. He ran a records check and drove to the residence of the owner of the license plates. The owner told him that a man she only knew as "Don" had taken the plates from her car some time earlier. Her car, a 1989 dark blue Toyota Camry, was in her garage and did not appear to the officer to be operable. The officer then returned to the police station and entered the stolen license plates in the National Crime Information Center data base. The following day, Defendant was arrested driving a light blue 1990 Toyota Camry bearing the stolen license plates.

**November 14, 2006, crimes.** On November 14, 2006, a Pocatello police detective drove to a trailer park because he had been informed that Defendant was there. The detective was driving a Ford Escape, which was rented by the police department and did not have any markings indicating it was a police vehicle. As the detective drove past the identified residence, he saw a blue car parked in front of it. He recorded the license number of the car and then parked within sight of it. He radioed dispatch and was advised that both the license plates on the

car and the car may have been stolen.  After watching the car for over an hour, he saw a male and female get into it and drive away.  The detective followed the blue car as it left the trailer park.

Two sheriff's deputies had also responded to the area to assist the detective.  Each of the deputies was driving a four-door pickup equipped with overhead lights and the words "Bannock County Sheriff" written on the front doors.  They were parked along a paved road that ran east-west and were informed when the blue car was leaving the trailer park.  The deputies saw the blue car pull onto the paved road and turn west towards them, but it was traveling in the eastbound lane.  One of the deputies activated the overhead lights on his pickup and began driving toward the blue car.  The car immediately made a u-turn and began heading east in the westbound lane.  The other deputy did not activate his overhead lights, but also began driving toward the blue car.  Upon seeing the approaching sheriff's vehicles, the detective positioned his vehicle so that it was facing north blocking the westbound lane of traffic.  He did so in order to stop any westbound traffic while leaving the eastbound lane open.

The blue car continued driving east in the westbound lane and struck the left front quarter panel of the detective's vehicle.  The pickup with its overhead lights on pulled up next to the blue car and stopped, and the other pickup pulled in behind the car and stopped.  The driver of the car turned around and looked at the deputy in the pickup behind him.  The driver then put the car in reverse and slammed into the pickup, and then he put the car in drive and again slammed into the detective's vehicle.  Defendant was the driver of the blue car.  He and his female passenger were arrested.  A subsequent search of the car revealed methamphetamine, a controlled substance.

**Eluding case.**  On November 15, 2006, the State commenced criminal proceedings against Defendant based upon the events of November 14, 2006.  In these proceedings, herein called the "Eluding Case," Defendant was charged with five felonies:  (1) attempting to elude a peace officer while causing damage to the property of another; (2) malicious injury to property consisting of the deputy's pickup and the detective's vehicle; (3) possession of a controlled substance, methamphetamine; (4) grand theft by possession of the blue car; and (5) aggravated assault upon a law enforcement officer, the detective.  Defendant waived a preliminary hearing on those charges, and he was bound over to answer in the district court before Judge Peter D. McDermott.  On November 30, 2006, the State filed an information charging those offenses, and

Defendant entered a plea of not guilty. The State later amended the information to add an allegation that Defendant was a persistent violator, having previously been convicted of at least two felonies.

Defendant was tried before a jury, and it returned a verdict finding him guilty of felony attempting to elude a peace officer; guilty of felony malicious injury to property for the second collision with the detective's vehicle; not guilty of possession of methamphetamine; not guilty of theft of the blue car; and not guilty of aggravated assault upon a police officer, but guilty of misdemeanor assault. After the jury returned its verdict, Defendant admitted to the allegations that he had previously been convicted of at least two prior felonies. He admitted that on October 2, 1995, he was convicted in Idaho of the felony of being an accessory to grand theft and that on February 27, 1989, he was convicted of three counts of felony theft in federal court in Montana.

After the trial, Defendant moved to reduce the felony conviction for malicious injury to property to a misdemeanor based upon the lack of evidence to support a finding that he had caused damages exceeding $1,000. The State had charged the collision with the county truck and the two collisions with the detective's vehicle as one offense of malicious injury to property. For malicious injury of property to be a felony, either the damages caused must exceed $1,000 in value or there must be a series of individual violations that are part of a common scheme or plan which together caused damages exceeding $1,000. I.C. § 18-7001(2). The jury had written on the verdict that Defendant was guilty of malicious injury to property only for the second collision with the detective's vehicle, and the State had not offered evidence as to the damages caused by that collision. It only offered evidence of the total damages caused by both collisions with the detective's vehicle. The district court granted the motion and reduced the malicious injury charge to a misdemeanor.

**Grand theft case.** On November 30, 2006, the State commenced criminal proceedings against Defendant based upon the theft of the saddles on November 13, 2006. In that case, which is herein called the "Grand Theft Case," the State charged Defendant with one count of grand theft. Defendant waived a preliminary hearing, and he was bound over to answer in the district court before Judge Robert C. Naftz. On December 21, 2006, the State filed an information charging Defendant with grand theft, and he entered a plea of not guilty. The State later amended the information to add an allegation that Defendant was a persistent violator. Defendant's first trial ended in a mistrial because his counsel became ill during the trial. He was

4

tried again, and the jury returned a verdict of guilty. After the jury's verdict, Defendant admitted the allegations of the prior felonies mentioned above.

**Sentencing.** Judge McDermott sentenced Defendant on all charges for which he was convicted in both cases. For the misdemeanors of malicious injury to property and assault, he sentenced Defendant to six months and three months in jail, respectively. With credit for time served, Defendant did not have to serve any additional time on those charges.

For the crime of attempting to elude a peace officer, the district court sentenced Defendant to eighteen years in the custody of the Idaho Board of Correction, with eight years fixed and ten years indeterminate. The court also suspended Defendant's driving privileges for two years commencing upon his release from confinement. Finally, the court ordered that a civil judgment be entered against Defendant for restitution in the total amount of $598.40 to Bannock County, $4183.83 to Pocatello, and $7079.82 to the owner of the blue car.

For the crime of grand theft, the court sentenced Defendant to eighteen years in the custody of the Idaho Board of Correction, with eight years fixed and ten years indeterminate. The court ordered that this sentence be served consecutively to the sentence for eluding.

**Resentencing on the eluding charge.** As mentioned above, on the eluding charge Judge McDermott sentenced Defendant to the custody of the Idaho Board of Correction for eighteen years, with eight years fixed and the remaining ten years indeterminate. The maximum length of incarceration for felony eluding is five years, but Defendant had admitted to having been previously convicted of at least two felonies, which made him a persistent violator and extended the maximum penalty to life. On December 4, 2009, Defendant moved to withdraw his admission to having committed the prior alleged felonies. When the information was amended to add the allegations of being a persistent violator, the court incorrectly advised Defendant that being found to be a persistent violator "will add an additional five years fixed to your sentence." Prior to Defendant admitting the existence of the prior felonies after the jury had returned its verdict in the Eluding Case, the court did not correct that misstatement. By the time Defendant filed his motion, Judge McDermott had retired, and so the motion was heard by Judge Robert C. Naftz. He granted the motion and presided over Defendant's jury trial on the enhancement allegations and over Defendant's subsequent criminal proceedings. The jury found that Defendant had been convicted of being an accessory to grand theft, a felony, on October 2, 1995, in Bannock County, Idaho, and that he had been convicted of three counts of felony theft on

5

March 2, 1989, in the federal district court of Montana. On September 13, 2010, the court sentenced Defendant to an indeterminate period of seven years in the custody of the Idaho Board of Correction for "the crime of PERSISENT [sic] VIOLATOR, as defined in Idaho Code §19-2514."

On October 18, 2010, Defendant filed a motion under Idaho Criminal Rule 35 for a reduction in sentence. He pointed out that being a persistent violator was not a separate crime; it only extended the maximum period of incarceration for the felony from five years to life. Therefore, he had to be resentenced for felony eluding and the sentence on the grand theft charge could no longer be consecutive to the new sentence on the eluding charge. Judge Naftz agreed and reconsidered the sentence, but imposed the same sentence as Judge McDermott had imposed and ordered that the sentence for eluding be served consecutively with the sentence for grand theft.

Defendant timely appealed the judgments in both cases and the order on his Rule 35 motion. The appeals were consolidated, and were initially heard by the Idaho Court of Appeals. It upheld Defendant's convictions and sentences for all crimes except malicious injury to property. Defendant filed a petition for review, which this Court granted. When we grant a petition for review, we do not review the decision of the Court of Appeals. We hear the case anew as if the appeal had initially come directly to this Court. *State v. Suriner*, 154 Idaho 81, 83, 294 P.3d 1093, 1095 (2013).

## II.
### Alleged Errors in the Eluding Case.

The jury trial in the Eluding Case began on February 27, 2007, and concluded the next day. Judge McDermott presided over this trial. Defendant raises five alleged errors that occurred in connection with that case.

**A. Did the District Court Err in Instructing the Jury on the Elements of the Crime of Attempting to Elude a Peace Officer?**

The crime of attempting to elude a peace officer is defined by statute as follows:

Any driver of a motor vehicle who wilfully flees or attempts to elude a pursuing police vehicle when given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a misdemeanor. The signal given by a peace officer may be by emergency lights or siren. The signal given by a peace officer by

6

emergency lights or siren need not conform to the standards for decibel ratings or light visibility specified in section 49-623(3), Idaho Code. It is sufficient proof that a reasonable person knew or should have known that the visual or audible signal given by a peace officer was intended to bring the pursued vehicle to a stop.

I.C. § 49-1404(1). Subsection (2) of the statute specifies the circumstances in which the crime will constitute a felony, and one of those circumstances is that while committing the crime, the driver caused damage to the property of another. I.C. § 49-1404(2).

The jury instruction given by the court was as follows:

In order for the defendant to be guilty of Fleeing or Attempting to Elude a Peace Officer, the State must prove each of the following:
1.     On or about the 14th day of November, 2006
2.     In the county of Bannock, State of Idaho;
3.     Defendant JAMES LEROY SKUNKCAP, the driver of;
4.     a Motor Vehicle; to wit: a blue Toyota Camry bearing Idaho license 1BF9120, in the Kraft Rd. and Main St. area;
5.     Did willfully flee or attempt to elude a pursuing police vehicle;
6.     when given a visual or audible signal to bring the vehicle to a stop; and
7.     while doing so, causes damage to the property of another or bodily injury to another.

*** It is sufficient proof that a reasonable person who knew or should have known that the visual or audible signal given by a peace officer was intended to bring pursued vehicle to a stop.*

If each of the above has been proven beyond a reasonable doubt, you must find the defendant guilty. If any of the above has not been proven beyond a reasonable doubt, you must find the defendant not guilty.

Defendant challenges the sentence in the instruction which states: "** It is sufficient proof that a reasonable person who knew or should have known that the visual or audible signal given by a peace officer was intended to bring pursued vehicle to a stop." He argues that the wording "It is sufficient proof" could have led the jury to find him guilty without consideration of the other elements of the crime listed above it.

Defendant did not object to this instruction. When "the alleged error was not followed by a contemporaneous objection, it shall only be reviewed by an appellate court under Idaho's fundamental error doctrine." *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010). Under that doctrine, there must be an error that violates one or more of the defendant's unwaived

constitutional rights; the error must plainly exist; and the error must not be harmless. *Id*. The defendant has the burden of persuasion on these issues. *Id*.

The first inquiry is whether there was an error in the jury instruction. "Whether the trial court properly instructed the jury presents a question of law over which this Court exercises free review." *State v. Poe*, 139 Idaho 885, 905, 88 P.3d 704, 724 (2004). Whether the instruction was erroneous will depend upon how a reasonable juror would have interpreted the instruction. *State v. Hairston*, 133 Idaho 496, 515, 988 P.2d 1170, 1189 (1999).

Although we do not recommend the way that the instruction was drafted,[1] Defendant has failed to convince us that a reasonable juror would have interpreted it in the manner argued by Defendant. In context, the sentence beginning with the words "It is sufficient proof" would not reasonably have been construed to mean that a jury could convict solely upon that sentence. The instruction begins by stating that "the State must prove *each* of the following." (Emphasis added.) Immediately below the sentence at issue, the instruction states: "If *each* of the above has been proven beyond a reasonable doubt, you must find the defendant guilty. If *any* of the above has not been proven beyond a reasonable doubt, you must find the defendant not guilty." (Emphasis added.) Each and any of the above would include the challenged sentence. In context, it is also clear that the challenged sentence referred to the "visual or audible signal to bring the vehicle to a stop." We are not persuaded that the instruction misled the jury as to the elements of the crime that the State was required to prove beyond a reasonable doubt. Therefore, we affirm the judgment of conviction for the crime of eluding a peace officer.

## B. Did the District Court Err in Instructing the Jury on the Elements of the Crime of Malicious Injury to Property?

Defendant was found guilty of malicious injury to property. That crime is defined by statute as follows:

> Except as otherwise provided in subsection (2) of this section, every person who maliciously injures or destroys any real or personal property not his own, or any jointly owned property without permission of the joint owner, or any property belonging to the community of the person's marriage, in cases otherwise than such as are specified in this code, is guilty of a misdemeanor . . . .

---

[1] Instead of the language used in the challenged sentence in this case, the recommended Idaho Criminal Jury Instruction states, "The signal to stop must be given by emergency lights or siren which a reasonable person knew or should have known was intended to bring the pursued vehicle to a stop." ICJI 1033.

I.C. § 18-7001(1).

The district court instructed the jury according to the wording of the statute that Defendant would be guilty if he "maliciously injured or destroyed" the deputy's truck and the detective's car. The statute does not define the word "maliciously." However, Idaho Code section 18-101(4) states:

> The following words have in this code the signification attached to them in this section, unless otherwise apparent from the context:
> . . . .
> 4. The words 'malice,' and 'maliciously,' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law.

The court used part of the statutory definition of "maliciously" and instructed the jury that "[t]he word 'maliciously' means the desire to annoy or injure another or the intent to do a wrongful act."

During its deliberations, the jury submitted a note asking for further guidance as to the definition of "maliciously." The question was as follows: "If the act (the second hit on the [Detective] Collins vehicle) was done due to an effort to escape is that malicious?, or does it mean that the damage was the intent, not the escape. When committing a wrongful act is any intentional damage considered malicious?" In response to the question, the court told the jury to reread the definition of "maliciously" in the jury instructions. He also told them that because there was evidence of three collisions (two with the detective's vehicle and one with the deputy's pickup), if they found Defendant guilty they could write on the verdict form whatever collision was the basis of their verdict. The jury returned a verdict finding Defendant guilty of malicious injury to property, but they wrote on the verdict form the words "second collision to 2003 red Ford Escape."

On appeal, Defendant challenges both the district court's initial instruction on the meaning of the word "maliciously" and its answer to the jury's question. Although Defendant did not object to the initial instruction, while counsel and the court were discussing how to respond to the jury's question, defense counsel did state that "they should be instructed that unless the damage was intended, it wouldn't be malicious."

9

The statutory definition of "maliciously" is to be used "unless otherwise apparent from the context" of the applicable criminal statute. I.C. § 18-101. We agree with Defendant that the statutory definition of "maliciously" in section 18-101(4) does not apply as written to the crime of malicious injury to property as defined in Idaho Code section 18-7001(1). That statute requires that the defendant "maliciously injure[] or destroy[] any real or personal property." The statute is obviously intended to protect against injury to property. However, the use of the word "maliciously" indicates that it is not intended to protect against the merely negligent or accidental injury to property. It obviously requires a different state of mind.

The wording at issue was adopted before statehood in a malicious mischief statute that declared guilty of a misdemeanor "[e]very person who maliciously injures or destroys any real or personal property not his own." Rev. Stat. Terr. of Idaho § 7150 (1887). The 1856 edition of Bouvier's Law Dictionary defined malice as a "wicked intention to do an injury." http://www.constitution.org/bouv/bouvier_m.htm (accessed June 11, 2014). Similarly, Noah Webster's 1828 edition of the American Dictionary of the English Language defined malice as follows: "Extreme enmity of heart, or malevolence; a disposition to injure others without cause, from mere personal gratification or from a spirit of revenge; unprovoked malignity or spite." http://webstersdictionary1828.com/Home?word=Malice (accessed June 11, 2014). From these definitions, it is apparent that the state of mind of someone who maliciously injured property would be that the person intentionally did so.

However, not everyone who intentionally injures another's property would necessarily be acting maliciously. For example, in *State v. Churchill*, 15 Idaho 645, 98 P. 853 (1909), the defendant had been convicted of violating section 7153 of the Revised Statutes of the Territory of Idaho (1887). *Id*. at 648-49, 98 P. at 854. That statute stated, "Every person who maliciously kills, maims, or wounds any animal, the property of another, or who maliciously and cruelly beats, tortures, or injures any animal, whether belonging to himself or another, is guilty of a misdemeanor." The defendant had shot dogs that were chasing his cows and hogs, killing one dog and wounding others. *Id*. at 649, 98 P. at 854. This Court reversed the conviction because "[t]he defendant evidently used violence on the dogs through a desire and for the unmistakable purpose of removing them from his premises, and preventing them from annoying and disturbing his livestock." *Id*. at 656, 98 P. 857. We then stated:

10

> That he did not act with criminal and malicious intent to wantonly and recklessly destroy the property of another is too clear and apparent to leave any question for submission to a jury on that score. "Malicious," as used in the statute under which this prosecution is had, is not equivalent to the word "wrongful" as used in the law of torts. The former word means more than the latter. It necessarily involves crime, while the latter does not necessarily do so.

*Id.*

In *State v. Rogers*, 30 Idaho 259, 163 P. 912 (1917), the trial court in a murder prosecution instructed the jury regarding malice that "[m]alice includes not only anger, hatred and revenge, but every other unlawful and unjustifiable motive." *Id*. at 266, 163 P. at 914. This Court held that the instruction should not have been given. *Id*. In doing so, we quoted from an opinion written by Chief Justice Shaw that malice in its legal sense did not mean hatred, ill will, or hostility to another; it "characterizes all acts done with an evil disposition, a wrong and unlawful motive or purpose; the wilful doing of an injurious act without lawful excuse." *Id*.

Considering the above authorities, we hold that the word "maliciously" in Idaho Code section 18-7001(1) means an intent to damage the property without a lawful excuse for doing so.[2] In this case, the court instructed the jury that "[t]he word 'maliciously' means the desire to annoy or injure another or the intent to do a wrongful act." If Defendant was intending to do a wrongful act (elude a peace officer) and accidentally injured the property of another (the deputy sheriff's pickup), the jury could find him guilty. The district court's instruction defining the word "maliciously" differs from the definition that we adopt today. However, "[a]n erroneous instruction will not constitute reversible error unless the instructions as a whole misled the jury or prejudiced a party." *State v. Draper*, 151 Idaho 576, 588, 261 P.3d 853, 865 (2011).

The jury's question asked whether the intent to do a wrongful act meant an intent to do any wrongful act (i.e., escape) or an intent to damage the detective's vehicle. The jury obviously concluded that the intent must be an intent to damage the detective's vehicle. Defendant collided with the detective's vehicle twice and the deputy's pickup once. The jury only found Defendant guilty of malicious injury for the second collision with the detective's car. At that point, Defendant could not escape. Defendant was on the northern side of the highway. One pickup was stopped immediately behind his car, the other pickup was stopped on the southern side of his

---

[2] Under the doctrine of transferred intent, a defendant could be guilty of malicious injury to property even though the property actually injured was not the property that the defendant intended to injure. *State v. Doe*, 144 Idaho 819, 821, 172 P.3d 1094, 1096 (2007).

car, and the detective's vehicle was stopped immediately in front of his car. The jury obviously concluded that Defendant was not attempting to escape when he rammed the detective's vehicle the second time. His intent was simply to cause further damage to the car. Therefore, we affirm the conviction for malicious injury to property.

## C. Did the Prosecutor Commit Fundamental Error in Questioning a Sheriff's Deputy?

During direct examination by the prosecutor, one of the Sheriff's deputies testified that the detective had positioned his vehicle blocking the westbound traffic lane, leaving the eastbound lane open, and that Defendant's car had crashed into the detective's stopped vehicle. The following dialogue then occurred:

> Q. And how far behind him were you when he crashed into Detective Collins for the first time?
> A. The initial time he crashed, I was probably still three or four vehicle lengths behind the suspect vehicle.
> Once I seen him crash into the vehicle, I go, I'm going to have to make some aggressive action here because this guy doesn't have any regard for my safety, Detective Collins, or anybody out on the street that day.
> Q. Okay. What did you do at that point?
> A. Made a split second decision to pull right behind the suspect vehicle to—in an attempt to pin him in and keep him from going anywhere.

On appeal, Defendant contends that the deputy's statement that "this guy doesn't have any regard for my safety, Detective Collins, or anybody out on the street that day" deprived him of a fair trial because it was designed to appeal to the passions and prejudices of the jury. Because defense counsel did not object to the answer, this is reviewable on appeal only if it constitutes fundamental error. *Perry*, 150 Idaho at 228, 245 P.3d at 980. The first inquiry would be whether there was an error that violates one or more of the defendant's unwaived constitutional rights. *Id.* Defendant contends that this response violated his right to a fair trial. Under no stretch of the imagination could it have done so.

## D. Did the District Court Err in Instructing the Jury on the Crime of Assault?

The information filed by the State alleged that Defendant committed the crime of aggravated assault, a felony, as follows:

> That the said JAMES LEROY SKUNKCAP, in POCATELLO, in the County of Bannock, State of Idaho, on or about the 14th day of NOVEMBER,

2006, did threaten to do violence on a law enforcement officer with an apparent ability to do so, by use of a deadly weapon, A BLUE 1989 TOYOTA CAMRY BEARING LICENSE PLATE 1BF9120, without the intent to kill and/or by any means or force likely to produce great bodily harm, by CRASHING HIS CAR INTO DETECTIVE COLLINS CAR AT A HIGH RATE OF SPEED, knowing, or having reason to know the victim was a law enforcement officer.

A simple assault is a misdemeanor.  I.C. §§ 18-901 and 18-902.  An assault is an aggravated assault, a felony, if it is committed in one of three ways, one of which is "[w]ith a deadly weapon or instrument without intent to kill."  I.C. § 18-905(a).  If the victim of the assault has a specified job or position, which includes being a police officer, and the defendant knows or has reason to know of the victim's status, then the maximum punishment for the assault is enhanced to double what it otherwise would have been.  I.C. § 18-915(1)(b).  The jury found Defendant guilty of simple assault, a misdemeanor.

The statutory definition of simple assault is as follows:

> 18-901.  Assault defined.  An assault is:
> (a) An unlawful attempt, coupled with apparent ability, to commit a violent injury on the person of another; or
> (b) An intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.

The State did not offer a jury instruction setting forth the elements that it must prove in order to convict Defendant of simple assault.  It only offered an instruction regarding what must be proved in order for the jury to find Defendant guilty of aggravated assault with the sentence enhancement.

Defendant offered a jury instruction setting forth the elements that must be proved in order to convict him of simple assault, but he did not offer an instruction regarding the elements of aggravated assault.  Defendant's jury instruction was as follows:

> In order for the defendant to be guilty of Assault, the state must prove each of the following:
> 1. On or about the 14th day of November, 2006,
> 2. in the state of Idaho
> 3. the defendant, James L. Skunkcap, unlawfully attempted
> 4. with apparent ability
> 5. to commit a violent injury to, Bill Collins,
> or

13

6. intentionally and unlawfully threatened by word or act to do violence to Bill Collins,

or

7. did some act which created a well-founded fear in the other person that such violence was imminent.

If any of the above has not been proven beyond a reasonable doubt, then you must find the defendant not guilty. If each of the above has been proven beyond a reasonable doubt, you must find the defendant guilty.

Defendant's instruction did not correctly state the elements of simple assault. Elements numbered one through five accurately instructed the jury regarding one manner of committing an assault as defined in Idaho Code section 18-901(a) quoted above. Had the instruction stopped there, there would be no error. However, elements numbered six and seven do not accurately set forth alternative means for committing an assault. First, they should have been combined as one alternative, not set out as each being separate alternatives. Under section 18-901(b), an assault is "[a]n intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Second, even had they been combined as one alternative means of committing a simple assault, they should not have been set forth as an alternative to element number five. Rather, part of element number three and element number four should have been combined in element number five. Under Idaho Code section 18-901(a), an assault is "[a]n unlawful attempt, coupled with apparent ability, to commit a violent injury on the person of another." The instruction erroneously makes "[a]n intentional, unlawful threat by word or act to do violence to the person of another" and "coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent" taken from section 18-901(b) as alternative elements for "to commit a violent injury on the person of another," which is necessary to prove an assault under section 18-901(a).

The district court used Defendant's jury instruction to instruct the jury regarding simple assault. Now, Defendant contends on appeal that the court erred in doing so. The State argues that Defendant is barred from now challenging the instruction because it was invited error. In response, Defendant cites our opinion in *State v. Nunez*, 133 Idaho 13, 981 P.2d 738 (1999), in which we stated, "There is no invited error, as the state asserts, when defense counsel submitted improper instructions that were ultimately given." *Id*. at 20 n.3, 981 P.2d at 745.

14

Prior to 1980, this Court held that the invited error doctrine applied to jury instructions in a criminal case. *State v. Lopez*, 100 Idaho 99, 102, 593 P.2d 1003, 1006 (1979) ("The failure of the trial court to instruct on assault with a deadly weapon was caused by defendant's objection and therefore was invited error and will not be considered on appeal."); *State v. Johnston*, 61 Idaho 87, 90, 98 P.2d 628, 629 (1940) ("The record discloses this instruction was given upon the request of the appellant [defendant]. The error in it, if any, was invited by appellant and he cannot now be heard to complain of it."). In 1980, Idaho Criminal Rule 30 was changed to provide that it was not necessary to object to a jury instruction in order for a party to challenge that instruction on appeal. *State v. Smith*, 117 Idaho 225, 229, 786 P.2d 1127, 1131 (1990). Thus, when *State v. Nunez* was decided, a party could challenge a jury instruction on appeal even if the party did not object to the instruction in the trial court. Idaho Criminal Rule 30 was amended effective July 1, 2004, to provide that "[n]o party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict." I.C.R. 30(b).

"The purpose of the invited error doctrine is to prevent a party who caused or played an important role in prompting a trial court to give or not give an instruction from later challenging that decision on appeal." *State v. Blake*, 133 Idaho 237, 240, 985 P.2d 117, 120 (1999). One of the requirements to establish fundamental error is that the error "plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision)." *Perry*, 150 Idaho at 228, 245 P.3d at 980. In *State v. Adamcik*, 152 Idaho 445, 272 P.3d 417 (2012), we held that a defendant is not precluded by the invited error doctrine from challenging a jury instruction on appeal where he did not encourage the trial court to offer the specific instruction given, but merely failed to object. *Id*. at 477, 272 P.3d at 449. Here, the district court gave the instruction offered by Defendant. Where the error is the giving of a jury instruction proposed by the defendant, that matter should be resolved in post-conviction relief proceedings where the reason for the error can be explored. Therefore, we affirm Defendant's conviction for misdemeanor assault.

### III.
### Alleged Errors in the Grand Theft Case.

15

The jury trial in the Grand Theft Case began on July 5, 2007, and the court declared a mistrial as Defendant's counsel became ill during the trial. The re-trial began on August 15, 2007, and concluded the next day. Judge McDermott presided over this trial. Defendant raises two alleged errors that occurred in connection with that case.

**A. Is Defendant Entitled to a New Trial Due to Prosecutorial Misconduct in Eliciting Testimony that Defendant Refused to Talk to the Police after His Arrest?**

Defendant and his female friend were arrested on November 14, 2006. During his trial for grand theft, Bannock County deputy prosecuting attorney Cleave B. Colson committed a flagrant violation of his duty as a prosecuting attorney by presenting evidence in the State's case-in-chief of Defendant's post-arrest silence. The deputy prosecutor called Detective Ian Nelson as a witness to testify that when he attempted to interview Defendant, he refused to answer any questions. The sole purpose of the testimony was to seek to have the jury infer that Defendant must be guilty because he would not talk after he was arrested. The testimony was as follows:

> MR. COLSON: Q. Okay. And what did you do next?
> IAN NELSON: A. Detective Thomas and I were charged with trying to interview Mr. Edmo and his girlfriend—I'm sorry, Mr. Skunkcap and his girlfriend, Miss Edmo.
> Q. Regarding what?
> A. Regarding the incident that had occurred over on Kraft Road.
> Q. Okay. And did you interview the defendant?
> A. No, I did not.
> Q. Did you attempt to?
> A. Yes.
> Q. Where did you attempt to interview the defendant at?
> A. At the Pocatello Police Department.
> Q. And was that in an interview room?
> A. Yes, Detective Interview Room A.
> Q. And what did you say to him?
> A. I just advised him that we would like to talk with him about the incident that had taken place. That was about all I got out.
> Q. And that person that you interviewed was James Skunkcap—or attempted to interview?
> A. Yes.
> Q. Do you see that person here in the courtroom today?
> A. Yes, I do.
> Q. Would you please point him out and describe his clothing.
> A. He is sitting at the defense table, black jeans and black checkered shirt.
> Q. And was there anyone else in the room with you?
> A. Detective Thomas.

16

Q. Okay. And how did you attempt to begin the interview?

A. Exactly as I explained. I told him that we would like to talk with him about the incident that had occurred.

Q. Okay. And what was his response?

A. He pretty much started cussing at myself and Detective Thomas. And at that time Sergeant Lind—

Q. Do you recall any specifics as to what he said?

A. I can't quote him exactly. It was something along the lines of—"I'm not f***ing talking to you guys."

Q. Okay. And then you mentioned you spoke with Barbara Edmo also?

A. Attempted to.

Q. Was that on the same day?

A. Yes, it was just before Mr. Skunkcap.

Q. And what was the result of that?

A. I advised her of her Miranda warning and she invoked her rights.

Q. Did the defendant invoke his rights?

A. More or less. I didn't get to Mirandize him.

Q. You never got a chance to read the Miranda warning?

A. No, sir.

Q. Okay. And at any point were you able to interview the defendant?

A. No.

Q. Okay. And how about Miss Edmo?

A. Yes, I was.

Q. And when did you—when did that interview take place?

A. I interviewed her regarding a different incident later that evening at the Bannock County Sheriff's Office in the booking area.

Q. What incident was that?

A. It was the theft of the saddle from Vickers Western Wear.

Q. Okay. And was she willing to talk to you?

A. Yes, sir.

Q. What was her response?

THE COURT: Just a second.

Ladies and gentlemen, people have the right if they want to not to talk with the police, and so I don't want you to hold it against Mr. Skunkcap that he wouldn't give a statement.

Detective Nelson did not set out to interview Defendant about the theft of the saddles. He was told to interview him about "the incident that had occurred over on Kraft Road," which was the Eluding Case, but the jury would not have known what that incident was. The deputy prosecutor then elicited testimony that Defendant's female companion was willing to talk about the theft of the saddles. Because she was not on trial with Defendant for that offense, the deputy prosecutor was obviously attempting to infer that she was willing to talk because she was innocent, but Defendant was unwilling to talk because he was guilty.

17

The following day, the deputy prosecutor recalled Detective Nelson in the State's case-in-chief to have him testify again about Defendant's refusal to talk, in order to reinforce the inference that Defendant was guilty due to his refusal to talk. The testimony was as follows:

> Q. Okay. And as to any further investigation involving the defendant, you indicated before that you had attempted to interview him on November 14th of 2006; did you ever attempt to interview him again?
> A. Yes, I did.
> Q. And when did you do that?
> A. November 15th.
> Q. And where did you try to do that at?
> A. Bannock County Jail booking area.
> Q. Okay. And did you have contact with him on that day?
> A. Yes, I did.
> Q. What was the nature of that contact?
> A. I wanted to advise him that he was going to be charged with Grand Theft for the saddles at Vickers.
> Q. Okay. And did you advise him of that?
> A. Yes, I did.
> Q. And what was his response?
> A. Jurors, please excuse me—his response was something along the lines of, "Keep stacking on the f***ing charges. We both know that they're going to reduce them all to one misdemeanor."
> He then instructed me to get the f*** out of his cell.

Not only did the deputy prosecutor again seek to have the jury draw an inference that Defendant would not talk because he was guilty, but the deputy prosecutor also let the jury know that Defendant was in jail on some other charge, because Detective Nelson went to Defendant's jail cell to tell him that he would be charged with the theft of the saddles.

"Every person accused of [a] crime in Idaho has the right to a fair and impartial trial," *State v. Sharp*, 101 Idaho 498, 504, 616 P.2d 1034, 1040 (1980), "whether guilty or innocent," *State v. Fowler*, 13 Idaho 317, 325, 89 P. 757, 760 (1907). We long ago held, "It is the duty of the prosecutor to see that a defendant has a fair trial, and that nothing but competent evidence is submitted to the jury." *State v. Irwin*, 9 Idaho 35, 44, 71 P. 608, 611 (1903). Prosecutors should not "exert their skill and ingenuity to see how far they can trespass upon the verge of error, [because] generally in so doing they transgress upon the rights of the accused." *Id.* "It is clearly erroneous for a prosecutor to introduce evidence of the defendant's postarrest silence for the purpose of raising an inference of guilt." *State v. Hodges*, 105 Idaho 588, 591, 671 P.2d 1051,

1054 (1983). There is simply no excuse for deputy prosecutor Colson's conduct in this case. It is simply a blatant violation of his duty as a prosecutor and of Defendant's constitutional rights.

Defendant's counsel did not object to the testimony at trial. Therefore, the prosecutorial misconduct is only reviewable on appeal under the doctrine of fundamental error. Under that doctrine, there must be an error that violates one or more of the defendant's unwaived constitutional rights; the error must plainly exist; and the error must not be harmless. *Perry*, 150 Idaho at 228, 245 P.3d at 980. Defendant has the burden of persuasion on each of those issues.

The deputy prosecutor's error here violated Defendant's unwaived constitutional right to remain silent under the Fifth Amendment. As we stated in *State v. Moore*, 131 Idaho 814, 965 P.2d 174 (1998), "[T]he defendants' Fifth Amendment right not to have their silence used against them in a court proceeding is applicable pre-arrest and pre-*Miranda* warnings. The constitutional right is always present." *Id.* at 820, 965 P.2d at 180. The deputy prosecutor's misconduct was also clear. There is nothing to indicate that defense counsel's failure to object was a tactical decision. Defendant did not testify at the trial. The final issue is whether the error was harmless. Because Defendant did not object to this questioning, he has the burden of persuading this Court that the error was not harmless—that there is a reasonable likelihood that the error affected the verdict. *Jones v. U.S.*, 527 U.S. 373, 390 (1999); *Perry*, 150 Idaho at 226, 245 P.3d at 978.

Defendant has not persuaded us that there is a reasonable likelihood deputy prosecutor's misconduct affected the verdict. The store employee who was going home was an eyewitness to the theft. Although she did not initially identify Defendant from a photo lineup, she testified that she immediately recognized him when she first saw him in person in a hallway in the courthouse. She also identified him during the trial. At about 1:15 p.m., she saw Defendant putting a saddle into the trunk of the blue car, and she wrote down the license number of the car. Later that day at 4:30 p.m., Defendant arrived at a friend's house in a blue car. While there, Defendant opened the trunk of the car to get a beer, and the friend testified that he saw a saddle in the trunk and that it looked like there was "a hump . . . something was under it." The friend testified that Defendant asked him if he would help Defendant "get rid of them." The next day, Defendant was found driving the blue car with the same license plates as recorded by the store employee who saw him stealing the saddle. We are not persuaded that there is a reasonable likelihood that

19

the deputy prosecutor's misconduct affected the jury's verdict. We affirm the Defendant's conviction for grand theft.

**B. Did the district court err in failing to conduct a sufficient inquiry into the alleged conflict of interest between Defendant and his appointed attorney?**

After the jury returned its verdict, the district court took a recess and had the jury retire to the jury room. The court then told Defendant that it was ready to proceed with a trial on the allegation in the amended information that Defendant had at least two prior felony convictions, in order to establish that he was a persistent violator. Defendant's counsel, John C. Dewey, then advised the court that Defendant was going to admit that allegation. After Defendant did so, the court stated that it was going to ask Defendant some questions before accepting the admission.

One of the questions the court asked was, "And do you have any complaints or problems with the way your attorney has represented you?" Defendant answered:

> I've had a problem all the way through with this trial. There has been—my attorney, Randy Schulthies, has been trying to get off my case so many times, not showing up to court—there has been a lot of problems on this. It's been dismissed twice.
> That's just a lot of problems with this and my fastest speedy trial rights were over-ran with it, and the amount of time that I have with these attorneys—I had two hours, total, with them before this trial.
> That's all I got to say, sir. Thank you.

Randall D. Schulthies did not represent Defendant in the trial of this case. He was representing Defendant in the first trial of the grand theft case which began on July 5, 2007. During the first day of that trial, Mr. Schulthies became ill, was taken by paramedics to the hospital, and was unable to continue with the trial. The district court stated that it would be necessary to declare a mistrial and to reset the trial, and Defendant stated that he had no objection to doing so.

On August 2, 2007, Mr. Schulthies moved to withdraw as counsel for Defendant on the ground that Defendant had accused him of lying. The hearing on that motion was held four days later, with Defendant present. During the hearing, Defendant stated: "As we said before, you know, this is the third time he has tried to dismiss himself. You have asked me every time and I said, no, I don't want him to be dismissed because he—he is the top dog here." He later stated, referring to Mr. Schulthies, "And if I can't say, hey, Randy, what about this—if I can't ever

throw my ideas in or if I can't ever hash things out with him, and if he can't take constructive criticism, I don't know why he is in this profession." After expressing his dissatisfaction with how long the case was taking to get to trial, Defendant stated: "I don't want Randy to not be my attorney. I'm satisfied with Randy with what he does, you know. . . . So as far as this motion here, I don't want him to be dismissed from my case. I would like for him to carry on with it." At the conclusion of the hearing, the court granted Mr. Schulthies's motion to withdraw and appointed Mr. Dewey and Mr. Smith to represent him.

With respect to Defendant's right to a speedy trial, during jury selection Mr. Dewey moved to dismiss the case for lack of a speedy trial, and the district court denied the motion. That denial was not raised as an issue on appeal.

Finally, Defendant asserted that his attorneys had only spent a total of two hours with him prior to trial. Depending upon the facts, that may or may not be an issue for post-conviction relief, but it does not indicate any conflict that could be remedied by appointing substitute counsel. The jury trial was already completed. The district court observed the trial and stated that Defendant's counsel did an excellent job. "A trial court may appoint substitute counsel for an indigent defendant upon a showing of good cause. Whether substitute counsel should be provided is a decision that lies within the sound discretion of the trial court and will be reviewed on appeal for an abuse of discretion." *State v. Severson*, 147 Idaho 694, 702, 215 P.3d 414, 422 (2009). There is no showing that the district court abused its discretion in either not engaging in additional examination or not appointing substitute counsel.


## IV.
### Alleged Errors in Connection with the Resentencing.


### A. Did the District Court Err by Failing to Inquire into any Conflict between Defendant and His Counsel?

Defendant was permitted to withdraw his admission to being a persistent violator because the district court had misinformed him that admitting to the prior felonies would add five additional years of incarceration to his sentence when in fact it would extend the maximum possible period of incarceration to life. The maximum sentence for eluding was five years of incarceration, and with the persistent violator enhancement Judge McDermott sentenced him to eighteen years. The motion to withdraw Defendant's admission was filed by his counsel, Mr.

21

Dewey, on December 4, 2009. The motion was heard by Judge Naftz, who granted it by order entered on March 11, 2010.

On April 6, 2010, Defendant's counsel moved to withdraw because he worked for Defendant's prior counsel, Mr. Schulthies, who had represented Defendant when he had been misinformed by the court as to the consequences of admitting the prior felonies and "it's theoretically possible that the Defendant could allege that his attorney should have corrected the misstatement of the law made by the Court." Defendant's counsel stated that this created a conflict and that substitute counsel should be appointed. The motion was heard on April 8, 2010, in the absence of Defendant, and the district court denied the motion.

The trial on the allegation of being a persistent violator was scheduled to commence on July 23, 2010. On July 19, 2010, Defendant appeared with counsel, Mr. Dewey, before Judge Naftz for hearing on several motions. During the hearing, Defendant's counsel raised the issue of the motion to withdraw and asked the court to inquire of Defendant if he wanted Mr. Dewey to continue as his counsel. The court then asked Defendant if he was comfortable with him proceeding as his attorney, and Defendant answered that he was not. He explained that he was not comfortable because the public defender, Mr. Schulthies, had given him incorrect information and he was now "at the mercy of Mr. Dewey here, who is under the direction of Randy Schulthies." Defendant said he felt "it would be better to have a conflict attorney." The court denied Mr. Dewey's motion to withdraw. The following day, the court received a letter from Defendant expressing concerns as to whether Mr. Dewey could adequately represent him. Attached to the letter were copies of letters he had sent to Mr. Dewey repeatedly asking whether there was anything to be gained by admitting the persistent violator charge rather than going to trial and when he would be brought back to the county for trial.

"A trial court may appoint substitute counsel for an indigent defendant upon a showing of good cause. Whether substitute counsel should be provided is a decision that lies within the sound discretion of the trial court and will be reviewed on appeal for an abuse of discretion." *Severson*, 147 Idaho at 702, 215 P.3d at 422. The Sixth Amendment to the Constitution of the United States has been construed to ensure that a defendant receives conflict-free counsel in state criminal proceedings. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). "In order to ensure that a defendant receives conflict-free counsel, a trial court has an affirmative duty to inquire into a potential conflict whenever it knows or 'reasonably should know that a particular conflict may

22

exist.'" *Severson*, 147 Idaho at 703, 215 P.3d at 423. "[A] trial court's examination of the potential conflict must be thorough and searching and should be conducted on the record." *Id*. at 704, 215 P.3d at 424.

There was no conflict of interest between Defendant and his counsel. Assuming Mr. Schulthies made a mistake, it had been corrected with no harm to Defendant. Based upon that alleged error, Defendant did not have a claim against his prior counsel, and there would be no conflict created by Mr. Dewey being an employee of Mr. Schulthies. The district court did not err in finding that there was no conflict.

After the hearing in which the district court affirmed the denial of the motion to appoint substitute counsel, Defendant submitted a letter to the court reflecting his lack of confidence in having Mr. Dewey represent him and Mr. Dewey's failure to respond to Defendant's letters. The letter to the court did not state any facts indicating that Mr. Dewey was not competent to represent Defendant, nor did the letter indicate that there was any conflict. The only issue that was going to be tried on July 23, 2010, was whether Defendant had been previously convicted of at least two felonies prior to committing the felony of attempting to elude a peace officer on November 14, 2006. Defendant had already admitted the prior felonies on August 16, 2007, after the jury had returned its verdict in the grand theft case. Defendant had not challenged his admission of the prior felonies in that case.

The mere lack of confidence in an otherwise competent counsel is not grounds for the appointment of substitute counsel. *State v. McCabe*, 101 Idaho 727, 729, 620 P.2d 300, 302 (1980). "An indigent defendant has no right to select a particular appointed counsel," *State v. Grant*, 154 Idaho 281, 285, 297 P.3d 244, 248 (2013), nor does an indigent defendant have the right to reject a particular appointed counsel who is competent to represent the defendant in the particular matter. The district court did not err in failing to hold another hearing to further question Defendant.

**B. After Granting Defendant's Motion in the Eluding Case to Withdraw His Admission to the Prior Felonies, Did the District Court Err in Failing to Resentence Defendant in that Case?**

For Defendant's conviction for attempting to elude a peace officer, Judge McDermott sentenced Defendant to the custody of the Idaho Board of Correction for eighteen years, with

eight years fixed and ten years indeterminate. A sentence of over five years was only permissible based upon Defendant's admission to being a persistent violator. After Judge Naftz granted Defendant's motion to withdraw that admission, the matter was tried to a jury, which returned a verdict finding that Defendant had been convicted of the alleged prior felonies. On September 13, 2010, Defendant appeared in court for sentencing. Judge Naftz stated that he could not alter five of the eight years fixed that Judge McDermott had sentenced Defendant on the eluding charge. Judge Naftz stated that he would remove the additional three years fixed and reduce the ten years indeterminate to seven years indeterminate. He also stated that he could not alter Judge McDermott's order that the sentence on the grand theft charge be consecutive to the sentence on the eluding charge.

On October 18, 2010, Defendant filed a motion under Idaho Criminal Rule 35 for a reduction in sentence. He pointed out that he had to be entirely resentenced on the charge of felony eluding and that, upon being resentenced, the sentence on the grand theft charge could no longer be consecutive to the new sentence on the eluding charge because the sentence for the eluding charge would be subsequent to the sentence for the grand theft charge. The motion was argued on November 22, 2010, although Defendant was not present at the argument.[3] At the conclusion of the argument, Judge Naftz stated that he would impose on the eluding charge the same sentence imposed by Judge McDermott (eighteen years with eight years fixed and ten years indeterminate) and that the sentence on the eluding charge would be consecutive to the sentence on the grand theft charge.

On appeal, Defendant argues that the court failed to resentence him because it merely imposed the same sentence that had been imposed by Judge McDermott. Judge Naftz first stated that he had reviewed the presentence investigation report again and the information provided by defense counsel in connection with the sentencing. With respect to the sentence to be imposed, Judge Naftz stated, "I think, with regard to the sentence—the judgment that Judge McDermott imposed, the Court would again impose that same sentence. I'm not going to change it. I am going to—I have reconsidered it and determined that it was a justifiable sentence in this particular case." Judge Naftz also ordered that the sentence on the eluding charge would run consecutive to the sentence on the grand theft charge. Judge Naftz did not fail to resentence

---

[3] Defendant has not argued on appeal that he had the right to be present at the resentencing pursuant to Idaho Code section 19-2503.

24

Defendant. He simply decided to impose the same sentence that Judge McDermott had imposed, which he had the discretion to do.

## V.
## Conclusion.

We affirm the judgments of the district court.


Chief Justice BURDICK, Justices J. JONES, W. JONES, and HORTON **CONCUR.**