# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 43874-2016

STATE OF IDAHO, )
        Plaintiff-Respondent, )
v. )
ROBERT DEAN HALL, )
        Defendant-Appellant. )

Boise, September 2016 Term

2016 Opinion No. 109A

Filed: November 15, 2016

Stephen W. Kenyon, Clerk

**AMENDED OPINION
THE COURT'S PRIOR
OPINION DATED NOVEMBER
1, 2016 IS HEREBY AMENDED.**

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County. Hon. Michael R. McLaughlin, District Judge.

The judgment of the district court is <u>affirmed</u>.

Jason Pintler, Deputy State Appellate Public Defender, Boise, argued for Appellant.

Lori A. Fleming, Deputy Attorney General, Boise, argued for Respondent.

---

EISMANN, Justice.

This is an appeal out of Ada County from a judgment of conviction for the crime of murder in the second degree. The primary issue on appeal is whether the district court properly instructed the jury on the issue of self-defense. We hold that the district court did and affirm the judgment of conviction.

## I.
## Factual Background.

In September 2010, Kandi Hall ("Kandi") was unemployed, having been fired by the law firm where she had worked, and she wanted another paralegal job. Emmett Corrigan ("Emmett") was waiting to learn the results of the bar exam he had taken and wanted to hire a paralegal to

work for him when he began practicing law. They were introduced by a mutual friend. Kandi and Emmett were immediately attracted to each other, and within two weeks they began having a sexual relationship. Emmett passed the bar exam, and he hired Kandi in November 2010 to work for him in the law office he had opened. Their torrid sexual relationship continued, including having sexual intercourse in the law office, until March 11, 2011, when Kandi's husband, Robert Dean Hall ("Rob"), shot and killed Emmett in the parking lot of a pharmacy. A jury found Rob guilty of murder in the second degree. Kandi testified at trial that she always loved her husband, never intended to leave him, and was committed to their marriage.

On March 11, 2011, Kandi had left work at about 6:00 p.m., and upon arriving home she had discovered that Rob was in the garage packing large boxes. He told her that he had had it with the way she had been so nonresponsive to their relationship the last few months. As they continued their discussion, she admitted to having an affair with an attorney in Oregon, but she later recanted that statement. He left their house at about 8:45 p.m., and she left shortly thereafter. As she was backing out of their driveway, she had a phone conversation with Emmett. She told him she was going to the pharmacy to pick up a prescription, and he stated that he would meet her there.

On March 11, 2011, Emmett had left work sometime after Kandi did. When he arrived at home, his wife confronted him about their marital problems. He responded by becoming angry. At some point, he had the telephone conversation with Kandi Hall. He told her he would meet her at the pharmacy parking lot. He then told his wife that he had to go pick up a prescription and left.

After Kandi had picked up her prescription, she got into Emmett's pickup. After stopping for gas, he began driving around. He ultimately parked in a subdivision being developed, where they had sexual intercourse for the second time that day. Kandi then received a call from her older daughter, who wondered where she was. The daughter had seen Kandi's car in the pharmacy parking lot and had called Kandi, but Kandi had not answered the call. She had then called Rob to ask where Kandi was. Kandi told her daughter that she was just driving around with a female friend.

As Emmett was driving back to the pharmacy parking lot, Kandi received a call from Rob. Emmett grabbed her phone and asked Rob, "What's up chief?" Kandi described Emmett's tone of voice as being aggressive. Kandi could only hear Emmett's side of the conversation. He

2

said to Rob: "Yeah, we're talking about life. Have you got a problem with that?" Kandi described Emmett's tone of voice as being derogatory, derisive, and challenging. Rob apparently responded, and Emmett said to him, "Yeah, I'm going to crack your f***ing head." Kandi described Emmett's tone of voice as being threatening. Emmett then said, "Just wait there. We'll be right there." Kandi described Emmett's tone of voice as being aggressive.

Emmett drove into the pharmacy parking lot shortly after 10:00 p.m. He parked, he and Kandi got out of Emmett's pickup, and Rob got out of his pickup. Rob had a compact, .380 ACP caliber pistol with a laser sight. Rob was dressed in sweat pants and a black, pull-over hoodie with a kangaroo pocket. Before getting out of his pickup, Rob had removed the pistol from the holster in which he carried it in the pickup, left the holster there, and put the pistol in the kangaroo pocket of his hoodie.

Kandi was the only witness to what then occurred. Prior to the trial, she gave accounts of what had occurred that differed from her trial testimony. During the final jury instruction conference, the district court discussed its jury instruction regarding the use of such pretrial statements. When doing so, the court stated, "Frankly, in my many years as a judge, I don't know that I've seen a witness to a case who has made so many conflicting statements and/or the level of impeachment." In ruling on Rob's motion for a new trial, the district court again stated with respect to Kandi's credibility:

> Frankly, any testimony by Ms. Hall, in my 31 years on the bench I don't think I've seen a witness more thoroughly discredited in the course of a proceeding. And the jury had a right to not consider that as evidence, that when she testified at the trial and said there was a very strong push, that she turned around, she heard some kind of grunting noises and then the firearm was discharged. They could have chosen to completely ignore that.

However, the central issue on appeal concerns whether the facts justified a particular instruction on self-defense, and therefore we will state the facts in a manner most favorable to Rob, which is Kandi's trial testimony.

She testified that after everyone was out of their respective vehicles, Emmett was standing against his pickup, leaning backward against it with his arms crossed, and Rob walked over to where Emmett and Kandi were, but he and Rob were "pretty far apart." Rob asked, "What's going on?" and Emmett answered, "She doesn't want to be with you, Rob." Rob looked at Emmett and asked, "She wants to be with you?" Emmett then made statements intended to

3

insult Rob and to incite him to fight, concluding with, "She doesn't want to be with you." Rob looked at Kandi and said, "But you want to be—he has got five kids, Kandi." He then looked at Emmett and stated, "And your poor wife, she just had a baby, and she is at home while you're out with my wife." Emmett then lunged forward and pushed Rob in the chest with both hands, but not forcefully enough to make him fall. Kandi stepped between them, told Emmett to get in his pickup, told Rob they had to leave because their daughter called, turned around, and was walking toward her car when she heard scuffling on the ground behind her. She then heard three gunshots. She turned around and saw Rob standing with blood running down his face. He had his pistol in his right hand, and he then collapsed, dropping the pistol. She later saw Emmett lying on the ground.

Rob had a grazing bullet wound on the top left side of his head. According to expert medical testimony, although the bullet did not penetrate or fracture the skull, it caused a traumatic brain injury, a moderate concussion. As a result, he suffered retrograde amnesia and cannot recall what occurred. He did not testify at the trial, although statements he made to the police shortly after the incident were admitted.

Emmett had two gunshot wounds, one to the chest and one to the head. The bullet that hit his chest passed through his sternum at the level of the fifth rib, through the right ventricle of his heart, through the middle lobe of his left lung, and impacted his spinal column at the level of the tenth thoracic vertebrae. It entered the bone, but did not hit the spinal cord. However, the force transmitted to the spinal cord by the bullet impact would have cut off all electrical impulses below the point of impact, and he would not have been able to move anything below that point. He would have dropped to the ground as quickly as gravity could pull him down. From an abrasion that he suffered on the right side of his forehead, it appears that he pitched forward when he fell, hitting his head. This wound was fatal, but not immediately. The bullet that hit his head entered his skull just inside the hairline of his upper right forehead, traveled in a slight downward and leftward direction through the entire right side of his brain, and ended at the bottom part of his brain on the right side. It too was a fatal wound, but not immediately. After being shot, he could have lived for a short period of time.

The appeal was initially heard by the Idaho Court of Appeals, which upheld the judgment of the district court. We then granted Rob's petition for review. In cases that come before this Court on a petition for review of a decision of the Court of Appeals, we do not review the

4

decision of the Court of Appeals. *State v. Suriner*, 154 Idaho 81, 83, 294 P.3d 1093, 1095 (2013). We hear the case anew as if the appeal had initially come directly to this Court. *Id*.

## II.
### Did the District Court Err in Instructing the Jury on Self Defense?

The law relevant to self-defense in a homicide case is set forth in Idaho Code sections 18-4009 and 18-4010. The applicable portions of section 18-4009 and section 18-4010 are as follows:

> **Idaho Code section 18-4009:**
> Homicide is also justifiable when committed by any person in either of the following cases:
> 1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or,
> 2. When committed in defense of . . . person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony . . . ; or,
> 3. When committed in the lawful defense of such person . . . when there is reasonable ground to apprehend a design . . . to do some great bodily injury, and imminent danger of such design being accomplished . . . ;
>
> **Idaho Code section 18-4010:**
> A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

The issue is the failure of the district court to instruct the jury regarding subsection (1) of Idaho Code section 18-4009. The reason it is an issue is that Idaho Code section 18-4010 does not apply to that subsection, so there is no requirement that "the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone."

On October 4, 2012, the defense filed its proposed jury instructions and a memorandum supporting the proposed instructions. The proposed jury instructions included an instruction on justifiable homicide that was based upon subsections (1), (2), and (3) of Idaho Code section 18-4009.[1] In the accompanying memorandum, the defense argued that the jury instruction based

---

[1] The relevant portion of the proposed instruction was as follows:

upon section 18-4009(1) was supported by Kandi's testimony that Emmett made statements enticing Rob to fight and that he pushed Rob in the chest with both hands prior to being killed.

The defense also argued in the memorandum that an excusable homicide instruction should be given as defined in Idaho Code section 18-4012 based upon anticipated evidence showing that the shooting was accidental. Excusable homicide is one committed by accident or misfortune under the circumstances described in the statute.[2]

The district court did not instruct the jury regarding self-defense as set forth in subsection (1) of Idaho Code section 18-4009. The court's instruction, which was based upon Idaho Criminal Jury Instruction No. 1517, stated as follows:

> The defendant contends, as a defense to the above crimes, that the killing was justifiable because the defendant was resisting an attempt to do great bodily harm, was defending himself against a design to do great bodily harm, and/or was defending himself when reasonable grounds existed to apprehend a design to do great bodily harm.
> Under the law, homicide is justifiable in anyone of the following three (3) circumstances.
>
> I.
>
> The homicide was committed while resisting an attempt to do great bodily injury upon any person, including the defendant.
>
> II.
>
> The homicide was committed in defense of a person, including the defendant, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony. The circumstances must be sufficient to create a fear in a reasonable person and the defendant must have acted under the influence of such fears alone.
> . . . .
>
> III.
>
> The homicide was committed in the lawful defense of the defendant when there are reasonable grounds to apprehend a design to do some great bodily injury and imminent danger of such design being accomplished. The circumstances must be sufficient to create a fear in a reasonable person and the defendant must have acted under the influence of such fears alone.
>
> If the homicide appears to be justifiable, the defendant must, upon his trial, be fully acquitted and discharged. The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was not justifiable. If there is a reasonable doubt whether the homicide was justifiable, you must find the defendant not guilty.

[2] Idaho Code section 18-4012 states:

> Homicide is excusable in the following cases:
> 1. When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent.
> 2. When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat when no undue advantage is taken nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner.

A homicide is justifiable if the defendant was acting in self-defense.

In order to find that the defendant acted in self-defense, all of the following conditions must be found to have been in existence at the time of the killing:

1. The defendant must have believed that the defendant was in imminent danger of death or great bodily harm.

2. In addition to that belief, the defendant must have believed that the action the defendant took was necessary to save the defendant from the danger presented.

3. The circumstances must have been such that a reasonable person, under similar circumstances, would have believed that the defendant was in imminent danger of death or great bodily injury and believed that the action taken was necessary.

4. The defendant must have acted only in response to that danger and not for some other motivation.

5. When there is no longer any reasonable appearance of danger, the right of self-defense ends.

In deciding upon the reasonableness of the defendant's beliefs, you should determine what an ordinary and reasonable person might have concluded from all the facts and circumstances which the evidence shows existed at that time, and not with the benefit of hindsight.

The danger must have been present and imminent, or must have so appeared to a reasonable person under the circumstances. A bare fear of death or great bodily injury is not sufficient to justify a homicide. The defendant must have acted under the influence of fears that only a reasonable person would have had in a similar position.

Rob contends on appeal that the failure to instruct on self-defense as set forth in subsection (1) of Idaho Code section 18-4009 requires that his judgment of conviction be vacated and that he be granted a new trial.

**Rob did not object to the failure to instruct the jury regarding self-defense as set forth in Idaho Code section 18-4009(1).** Rule 30(b) of the Idaho Rules of Criminal Procedure requires the trial court to inform counsel of the court's proposed actions with respect to requested instructions and to give the parties an opportunity to "make objections outside the presence of the jury to such instructions or the failure to give requested instructions." *Id*. The rule also states, "No party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the instruction to which the party objects and the grounds of the objection."

The presentation of evidence began on October 10, 2012, and the State rested during the afternoon of October 19, 2012. After the jury was dismissed for the day, the district court held a

conference to discuss its proposed jury instructions. The court began by stating: "We're just going to go over proposed jury instructions a little bit. Again, it's not our final instructions conference. I've given you a clean copy of the instructions." At the conclusion of this conference, the court asked both sides if they had any additional instructions. Defense counsel Mr. Chastain asked if the court was denying the defense's justifiable homicide instruction, and the court stated it would take a look at it. The exchange was as follows:

> THE COURT: Now, did the state have any other proposed instructions other than [IDJI] 318 as noted earlier by Ms. Lorello?
> MS. LORELLO: No, Your Honor.
> THE COURT: No additional instructions? Defense?
> MR. CHASTAIN: Your Honor, I think we had made a request as to justifiable or excusable homicide in our request. Is the court declining to give those?
> THE COURT: Well, now, let's take a look at the instruction on self-defense. That's Instruction 30: "A homicide is justifiable if the defendant was acting in self-defense." You're saying you want the additional instruction on justifiable homicide?
> MR. CHASTAIN: I believe we requested it. I didn't bring that with me.
> THE COURT: I'll take a look at that. I'll take a look at that.

The parties concluded their presentation of evidence during the mid-morning of October 23, 2012. After the jury was dismissed for the day, the district court had another jury instruction conference. During the conference, the court brought up its excusable homicide instruction, which was proposed instruction No. 36. The court read the instruction as follows:

> Under the law, homicide is justifiable if any one of the following circumstances occur: the homicide was committed while resisting an attempt to do great bodily injury to the defendant; or the homicide was committed in defending oneself against one who manifestly intends or endeavors, by violence or surprise, to commit a felony.
> However, the bare fear of such acts is not sufficient unless the circumstances are sufficient to create such a fear in a reasonable person if the defendant acted under the influence of such fears alone.

The first paragraph of proposed instruction No. 36 set forth two circumstances in which a homicide was justifiable. The first circumstance was if "the homicide was committed while resisting an attempt to do great bodily injury to the defendant" (based upon subsection (1) of Idaho Code section 18-4009), and the second circumstance was if "the homicide was committed in defending oneself against one who manifestly intends or endeavors, by violence or surprise, to commit a felony" (based upon subsection (2) of Idaho Code section 18-4009). The second

8

paragraph was based upon Idaho Code section 18-4010, but the instruction did not limit the application of the second paragraph to the circumstance that was based upon subsection (2) of Idaho Code section 18-4009. The second paragraph would have erroneously applied to circumstances constituting justifiable homicide in the first paragraph.[3] The court also had a separate self-defense instruction, which was based upon subsection (3) of Idaho Code section 18-4009.

After it read aloud proposed instruction No. 36, the court noted that the State had objected that this instruction was duplicative of the court's self-defense instruction, which was proposed instruction No. 38. Defense counsel Ms. Kristal did not make any objection to proposed instruction No. 36. Instead, she stated that the court also needed to give an instruction on excusable homicide. She explained the need for an instruction on excusable homicide as follows:

> MS. KRISTAL: Which is also why we think the court needs to give the excusable homicide because it's clear that Mr. Hall doesn't know what happened. He only knows that he was in a fight and he got shot. The wife's boss shot him. The jury has to decide whether the shooting was accidental. Was it self-defense or was it, as the state says, that he was lying in wait and murdered Mr. Corrigan?
> We think that all of the evidence the jury has heard permits all of those instructions. Therefore, we would request that the judge continue to give excusable and justifiable and a self-defense instruction.

The court responded by explaining why it thought proposed instruction No. 38 was adequate. It stated:

> THE COURT: Well, because now when I look at Instruction 38, which is self-defense, that he believed—the defendant believed he was in imminent danger of death or great bodily harm—which again, while resisting an attempt to do great bodily harm to the defendant, that seems to be included in that. And then the homicide was committed in defending oneself against one who manifestly intends or endeavors by violence or surprise to commit a felony.
> Again, we have Part 1 of the self-defense. We have Part 3, "reasonable person under similar circumstances would have believed that the defendant was in imminent danger of death or great bodily injury and believed that the action taken was necessary." And it does cover that as well under—you can't just have a bare fear of such acts. Again, it gets back to that reasonable person standard. Would you agree?

---

[3] Idaho Code section 18-4010 does not apply to justifiable homicide committed under the circumstance set forth in subsection (1) of Idaho Code section 18-4009.

9

I mean, that's what I'm seeking clarification of. It just seems to me, and originally I just gave the justifiable homicide self-defense instruction because I thought not only was it consistent with all of the theories—or I shouldn't say theories, all of the potential reasonable construction of the evidence that it covered. Justifiable homicide. Am I wrong?

Ms. Kristal responded that proposed instructions Nos. 36 and 38 covered justifiable homicide, but there needed to be an instruction on excusable homicide.

MS. KRISTAL: Your Honor, I'll concede that both 36 and 38 cover justifiable homicide, but they don't cover excusable homicide. And under the evidence—

The district court then discussed the issue of excusable homicide. Ms. Kristal repeatedly argued that there was a need for an excusable homicide instruction because the killing may have been accidental.

MS. KRISTAL: Well, Your Honor, the evidence that is before the court, which has not been refuted, is that the gun falls out, Mr. Corrigan shoots my client. That's before the court. That's what he knows. He doesn't know how Mr. Corrigan gets shot. But the shooting is—it's believed that the shooting is accidental.
     I think we do have excusable homicide. We also have potentially a self-defense but what he knows stops with him getting shot by his wife's boss.
    . . . .
MS. KRISTAL: Okay. We've got Ms. Hall saying that Mr. Corrigan pushed. he watched—
THE COURT: That's true. She did at one point say, pushed, and I think she said something about maybe hearing some scuffling before she heard the shots go off.
MS. KRISTAL: And Mr. Hall says, we fought, we fought. So there is—it's for the jury to just—the evidence is there. The jury should decide whether the shooting was accidental. I think that the way it's—
THE COURT: You're saying it can't be ruled out.
MS. KRISTAL: It can't be ruled out.

The district court then asked if there were any other objections, corrections, or changes to the proposed instructions. Defense counsel Mr. Chastain asked the court to grant the defense motion for an acquittal, and defense counsel Ms. Kristal stated that the self-defense instruction should also apply to lesser included offenses. The court again asked if there were any other objections, corrections, or changes to the proposed instructions, and Mr. Chastain responded by stating that the court had not ruled on whether it would give an excusable homicide instruction.

MR. CHASTAIN: Judge, the only thing I want to add, and I know the court hasn't ruled whether it's giving the excusable around the issue of accident here.

10

But I want to urge the court to give that because if I'm not allowed to argue that what may well have happened here wasn't an accident, that takes away a big chunk of what Mr. Hall's defense certainly is. I mean, I go back to what Dr. Groben said here about an hour and a half ago, that you could come up with multiple scenarios for how those bullets got into Mr. Hall—excuse me—Mr. Corrigan.

And if the court excludes that argument, which I think fits very well under these facts, especially given what Mr. Hall said on his tape, the gun was out of his control. It fell on the ground, he got shot. He doesn't know what happened. That's a very viable defense for Mr. Hall. And to take it away by not giving that instruction I think would be clear error. So I'm going to ask the court to leave that in.

The district court asked if there were any other proposed instructions or objections, and Mr. Chastain answered, "Other than the direction to acquit him, that would be all we would request."

On the morning of October 24, 2012, the district court had the final jury instruction conference. It began by stating that it had e-mailed counsel its final instructions, and both counsel stated that they had received those instructions. During its comments, the court stated that it had withdrawn the justifiable homicide instruction [proposed instruction No. 36] because it was covered by the self-defense instruction and was repetitive. After discussing its modifications to several other jury instructions, the court asked, "So any other proposed instructions by the state or corrections or objections or additions to the final instructions?" The State responded, "Not from the state, Your Honor," and Mr. Chastain responded, "No, Your Honor." The court thereafter read the jury instructions to the jury, counsel for the parties gave their closing arguments, and the jury retired to reach its verdict.

Any error in failing to instruct the jury regarding justifiable homicide pursuant to subsection (1) of Idaho Code section 18-4009 was not preserved for appeal. Idaho Criminal Rule 30(b) states, "No party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the instruction to which the party objects and the grounds of the objection." Defense counsel did not object to the district court's failure to give an instruction that was based upon subsection (1) of Idaho Code section 18-4009. Merely submitting a proposed instruction that included the defense of justifiable homicide as set forth in Idaho Code section 18-4009(1) and a memorandum explaining why the defense thought the instruction should be given was not sufficient under Rule 30(b) to preserve any instructional error on that issue. Rule 30(b) required that defense counsel

11

object to the failure to give the instruction during the jury instruction conference and state distinctly the grounds of the objection. Therefore, Rob cannot assign as error the failure to instruct on subsection (1) of Idaho Code section 18-4009. The issue can only be raised as fundamental error.

**The failure to instruct the jury regarding Idaho Code section 18-4009(1) was not fundamental error.** When "the alleged error was not followed by a contemporaneous objection, it shall only be reviewed by an appellate court under Idaho's fundamental error doctrine." *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010). Under that doctrine, there must be an error that violates one or more of the defendant's unwaived constitutional rights; the error must plainly exist; and the error must not be harmless. *Id*. The defendant has the burden of persuasion on these issues. *Id*.

"The first inquiry is whether there was an error in the jury instruction." *State v. Skunkcap*, 157 Idaho 221, 227, 335 P.3d 561, 567 (2014). "Whether the trial court properly instructed the jury presents a question of law over which this Court exercises free review." *State v. Poe*, 139 Idaho 885, 905, 88 P.3d 704, 724 (2004). The district court's failure to instruct the jury regarding subsection (1) of Idaho Code section 18-4009 was not error.

"In charging the jury, the court must state to them all matters of law necessary for their information." I.C. § 19-2132(a). "A defendant in a criminal action is entitled to have his theory of the case submitted to the jury under proper instructions." *State v. Olsen*, 103 Idaho 278, 285, 647 P.2d 734, 741 (1982). "A defendant is entitled to an instruction where 'there is a reasonable view of the evidence presented in the case that would support' the theory." *State v. Eastman*, 122 Idaho 87, 90, 831 P.2d 555, 558 (1992). A defendant is not entitled to an instruction dealing with a defense theory that is not supported by the evidence. *State v. Johns*, 112 Idaho 873, 880–81, 736 P.2d 1327, 1334–35 (1987).

Rob's proposed instruction would have informed the jury that the homicide was justifiable if "[t]he homicide was committed while resisting an attempt to do great bodily injury upon any person, including the defendant." Subsection (1) of Idaho Code section 18-4009 states that a homicide is justifiable "[w]hen resisting any attempt . . . to do some great bodily injury upon any person." As Rob correctly states on appeal, subsection (1) of Idaho Code section 18-4009 "describes an actual, ongoing attack." He argues on appeal that "there was simply no evidence presented that would counter the claim, definitively or otherwise, that Mr. Corrigan

12

physically attacked Mr. Hall, and that the homicide was committed in response to Mr. Corrigan's actual, ongoing attempt to inflict serious bodily injury upon him." Whether there was error in giving a proposed instruction is not based upon a claim made by the party who proposed it. Rather, the issue is whether there was evidence presented during the trial that would support the giving of the instruction. *Eastman*, 122 Idaho at 90, 831 P.2d at 558. There was absolutely no evidence that would have supported the giving of a jury instruction based upon subsection (1) of Idaho Code section 18-4009. Specifically, there was no evidence that Emmett was engaged in an ongoing attempt to do great bodily injury to Rob when Rob shot him. In fact, when arguing for an excusable homicide instruction, both defense counsel argued that Rob does not know how Emmett was shot, and there were no other eyewitnesses to the shooting.

Kandi testified:

A. . . . . And he [Emmett] took his hands down and pushed off the back of his truck and lunged and pushed Rob, as I would have thought he was going to knock him [Rob] down. He didn't, but he pushed him on his chest, right here.
And that's when I got in between, and I said, "That's enough. You get in your truck. Rob, we've got to go. Hannah called. She is waiting for us."
And I went around Rob, started walking to my car.
. . . .
Q. After you got around your husband, you could no longer see the defendant or Mr. Corrigan. Isn't that right?
A. Correct.

Emmett allegedly pushing Rob on his chest would not constitute an attempt to do great bodily harm under the circumstances described by Kandi. More importantly, after the alleged push, Kandi stepped between them, told Emmett to get into his pickup, and told Rob they had to go because their daughter had called and was waiting for them. At that point, there was no ongoing physical activity at all between the two men. Thus, the push would not be evidence of an ongoing attack upon Rob by Emmett.

Kandi testified that as she was walking away, she heard scuffling. While he was in the hospital immediately after the killing, Rob described what was occurring to a police detective, who testified as follows:

Q. Did he [Rob] give any indication about whether he knew why he was there?
A. He said he had been shot in the neck.
Q. Did he say anything else about how that happened?
A. He said that it was his wife's boss that shot him.
Q. Did he give any indication of whose gun it was that he was shot with?

13

A. Yeah. He said it was his.
Q. Did he comment at all on whether he had some interaction with his wife's boss preceding the shot?
A. Yes.
Q. Do you recall what that was?
A. He said that the gun had fallen out of his pocket.
Q. By "his pocket," was he referring—
A. To his own pocket.
Q. Was the defendant referring to his own pocket?
A. To his own pocket. He said that—he said, "We fought for the gun, and then he got shot." He said, "He shot me."
Q. Did he say how Emmett was shot?
A. And he said "I shot" and then—but he didn't get the full word out of his mouth, and then he never said.
    Later on, I did ask him, "Who shot him?" And he said he did not know.
Q. When you say "who shot him," you mean who shot Emmett?
A. Correct.
Q. And he told you he didn't know?
A. Right.

Although Rob stated that Emmett had shot him, he did not state any facts to show whether it was an intentional shooting or an accidental one while they were fighting over Rob's pistol. Even if we assume that Emmett intentionally shot Rob, there is no evidence that Emmett was engaged in any ongoing attempt to do some great bodily injury to Rob at the time that Rob shot him.

Kandi testified at trial that she heard three gunshots, which she described as a "pop, and then a pause, and pop pop."[4] She then turned around and saw Rob standing with the pistol in his hand. Her testimony was as follows:

Q. Then what happened?
A. And as I heard the last pop pop, it startled me the first time, but I almost thought it was a backfire of some sort. I didn't really know what. It wasn't a boom or what I would think, but it sounded like a balloon popping almost.
    And I turned around. Well, I just turned, just to see my peripheral, because I just didn't have to go like this, I look over and Rob has got blood just coming down his face.
    And I ran over—turned around, ran over. He collapsed. The gun fell right in front of him. And I went over to him and got on my knees and pressed my—I was screaming, and put my hand on the wound on his head.

---

[4] Kandi had initially stated that there were two shots, then a pause, and then the third shot. One witness who heard the shots agreed with Kandi's initial statement, and another witness who heard the shots agreed with Kandi's trial testimony.

14

Q. Excuse me just a second. So you're telling us today that the first thing you saw when you turned around was the defendant with a gun in his hand.
A. Correct.
Q. Was it in his right or his left hand?
A. Right hand.
Q. Did you see Mr. Corrigan?
A. No, I did not.

If the first shot was fired by Emmett, Rob then obtained the pistol and shot Emmett twice, killing him. "Once the victim has retreated and the danger is abated, the privilege of self defense expires." *State v. Carter*, 103 Idaho 917, 919, 655 P.2d 434, 436 (1981). There is no evidence of what Emmett was doing after Rob gained possession of the pistol, and specifically there is no evidence that he was doing anything that could be construed as engaging in an ongoing attempt to inflict serious bodily injury upon Rob. There was no evidence of any injuries suffered by Rob other than the grazing bullet wound to his head. When Emmett was shot, he did not have a weapon, and there is no evidence that he was trying to regain the pistol or do anything. Therefore, there was not a reasonable view of the evidence supporting the defense's proposed instruction. Because there was no error in failing to give the instruction, there could not be fundamental error with respect to the failure to do so.

## III.
### Did the District Court Err in Denying Admission into Evidence of Emmett's Facebook entries?

On February 17, 2012, the defense filed a motion to admit various items of evidence, including Facebook posts made by Emmett on February 25 and March 10, 2011. The defense contended that "Corrigan made statements on Facebook indicating his desire to fight a male whom Corrigan had an altercation with on or about the middle of February 2011, and indicating that Corrigan's physical presence caused fear and apprehension in the male."

Three of Emmett's posts were marked on an attached exhibit, and in context the relevant posts were as follows:

Posts on February 25, 2011:

> Emmett:
> Nothin better than having someone try and call you out and when it comes go time they end up pissing their pants and not wanting any part of what they started

15

Response from another:
I had that happen to me tonight too!  When I came back and said let's do this he backed down like a baby back b****!!

Emmett:
Yeah Bro!  Mine happened last week.  Apparently they talk talk talk smack in Cali.  Here in Idaho talk is cheap.  Throwin down settles it once and for all!!

Posts on March 10, 2011:

Emmett:
So sad seeing people get manipulated by people who abuse, lie and cheat . . .

Response from another:
people like that need a serious ass kickin!!

Emmett:
I would kick their ass, but they are too scared to throw down . . . LOL!!!!
Next time I'll film it for ya!!

The defense contended that these posts were relevant and admissible under Idaho Rule of Evidence 803(3) to show Emmett's then existing state of mind in order to establish that he was the aggressor.  The State objected on the ground that the statements were hearsay and not within the state-of-mind exception because they do not reflect Emmett's state of mind on the date the posts were made, much less on the date he was killed.  The State also asserted that they were inadmissible under Idaho Rule of Evidence 403.  The district court ruled that the posts do "not specify who the 'male' is that Corrigan is referring to and is highly speculative that this desire pertained to the Defendant" and that the evidence would not be admitted because it is hearsay and irrelevant.

"Whether there is a proper foundation upon which to admit evidence is a matter within the trial court's discretion."  *State v. Koch*, 157 Idaho 89, 96, 334 P.3d 280, 287 (2014).  "To determine whether a trial court has abused its discretion, this Court considers whether it correctly perceived the issue as discretionary, whether it acted within the boundaries of its discretion and consistently with applicable legal standards, and whether it reached its decision by an exercise of reason."  *Reed v. Reed*, 137 Idaho 53, 57, 44 P.3d 1108, 1112 (2002).

16

On appeal, Rob contends that the Facebook posts "fit within the state of mind exception because they were statements of Mr. Corrigan's then existing intent to be the aggressor in a future confrontation with Mr. Hall." He asserts that the posts on February 25, 2011, about someone trying to call Emmett out last week refer to Rob, based upon trial testimony that Emmett and Rob had an argument sometime in February 2011 in the alley behind the law office and another argument in late February 2011 in front of Rob and Kandi's house. The trial testimony that Rob contends shows that the Facebook posts concerned Rob was not presented to the district court in connection with the pretrial motion seeking a ruling that the Facebook posts were admissible. In support of that motion, the defense did not present any argument asserting that Rob was the unidentified male who was the subject of the posts. Rob has failed to show that the district court abused its discretion in making its pretrial ruling that the Facebook posts were not admissible because it was highly speculative that they pertained to Rob.

## IV.
### Did the District Court Err in Permitting Testimony Regarding What Rob Was Taught in His Concealed Weapons Class?

During the seventh day of the jury trial, the state called an instructor who had taught a concealed carry class in November 2006 that Rob attended. Rob contends that it was error to permit the man to testify. However, the first issue is to determine the objections made during the trial.

When the instructor was first called to testify, the defense asked to take a matter up outside the presence of the jury. After the jury left the courtroom, defense counsel stated that he wanted "an offer of proof from the state how this is relevant to anything concerning Rob Hall's actions on March, 2011, and the allegations that he committed the crime of first degree murder." The defense added that the instructor probably did not remember Rob personally. The district court held that it was not going to require the State to make an offer of proof, and the jury was brought back into the courtroom.

During the State's questioning of the instructor, he was asked whether he taught a class that Rob participated in, and the instructor answered: "Yes, sir, I did. My records indicate that I did." The defense objected on the ground that that was not an identification. Upon further questioning, the instructor testified that he did not know Rob personally and could not identify

him. He could only testify that he taught the class in November 2006 and that a man named Robert Hall attended. The defense then stated: "Judge, I'm going to object to any further testimony by this witness. It's not related to this case." The district court sustained the objection, and the instructor stepped down.

Later that day, the prosecutor and defense counsel met with the district court to discuss the instructor. The prosecutor recited that he expected the instructor to say that he taught Rob, and the defense stated various objections: the class was remote in time; there is no way to show what Rob may have learned in the class or that he attended all class sessions; such testimony would assume that Rob had the pistol and fired it; the instructor would be talking about the fine points of the law and would be telling the jury what self-defense is and is not; the jury would assume that Rob was thinking about what he was taught during the confrontation on March 11, 2011; any testimony from the instructor was completely inadmissible; it would assume things not in evidence; the instructor would not know whether Rob was paying attention during the class; and such testimony would be more prejudicial than probative.

After hearing the party's arguments, the district court stated that Rob's "knowledge and experience with a weapon" would be relevant, "In other words, was he a skilled marksman? Was he not? Was this the first time he had ever possessed a gun?" The court stated that it was "not going to let this witness testify as to the law of self-defense." The court said that whether Rob absorbed what he was taught was not the issue and that the class was not too remote. The court ruled that it would allow the instructor to testify upon a showing that the Mr. Hall who took the class was the Mr. Hall on trial and that "if you can lay that foundation, I'll find that it's relevant, and upon further foundation, that it's admissible." This ruling by the district court has not been challenged on appeal.

On the eighth day of the trial, the State presented Rob's application for a concealed weapons permit, which showed that he took the instructor's class on November 4, 2006. The State then recalled the instructor. The State moved to admit a document that was a roster of the instructor's 2006 students, and the defense objected. The objection was, "I'm going to reiterate our previously made objection and ask that it be continuing throughout this testimony." The district court responded: "Noted to be a continuing objection. Overruled. It will be admitted." Neither defense counsel nor the district court identified the "previously made objection." Was it the objection made when the instructor first testified in open court, that the instructor's testimony

18

was "not related to this case" because he could not identify Rob as being the Rob Hall in the class, or was it one of the objections made during the out-of-court discussion regarding the instructor's testimony? That type of continuing objection does not preserve an objection to whatever the witness may thereafter say. As we stated in *Hansen v. Roberts*, 154 Idaho 469, 299 P.3d 781 (2013):

> Moreover, a broad continuing objection not based upon the proper standard or ground and made at the start of [the witness's] testimony did not preserve an objection to [the witness's] opinion that the accident was precipitated by [the plaintiff's] careless right-hand turn. Continuing objections are difficult for trial courts to properly police unless there has been a meaningful argument and specific ruling on the subject matter of the objection. Proper practice is to frame an objection as to the specific area that preserves it for appellate review and then request a continuing objection on that ground. If it is not clear to the trial court as to the specific area, the court should inquire further.

*Id*. at 474, 299 P.3d at 786.

Defense counsel did make two objections during the instructor's testimony, and the district court overruled those objections. The first objection came when the instructor was asked to explain what the "AOJ triad" was that he taught in his class. As he began to answer, defense counsel objected on the ground that the instructor was testifying about legal standards, and the court overruled the objection. What occurred was as follows:

> Q. Explain to me what that AOJ triad is that you teach your students to take your class.
> A. AOJ is ability, opportunity, and in jeopardy. Before I teach that you are allowed to use deadly force against another human being—
> MR. CHASTAIN: Judge, I'm going to have to object at this time. This is a legal—this is testimony on legal standards. That's something the court will instruct the jury on. I thought the court had previously ruled that he would not be allowed to get into legal matters.
> THE COURT: I'll overrule. I think this is just teaching in the trial. I don't think he is instructing the jury.

The instructor then explained the AOJ triad as follows:

> THE WITNESS: Ability means that the defender has knowledge that the aggressor has the ability to cause death or great bodily harm. They either have a weapon, the defender knows that the person has a weapon, or they have personal knowledge of the individual that they've been trained in the destructive arts of hand-to-hand combat where they can kill or cripple with their bare hands.

19

Opportunity means that the person has the power to immediately employ the ability with a firearm. It's a line of sight. If they can see the person, and they can shoot the person.

If it's a contact-type weapon, then we look at distance and obstacles. And that's opportunity.

Jeopardy is the person, is the aggressor acting in a manner which a reasonable and prudent person would conclude the aggressor's intent is to in fact kill or cripple.

Before the State completed its direct examination of the instructor, the district court took the afternoon recess. During that recess, it proposed a limiting instruction regarding the instructor's testimony, to which both sides agreed. When the trial resumed, the court gave the following limiting instruction:

Before [the instructor] continues his testimony, I'm going to give you a limiting instruction, ladies and gentlemen.

[The instructor] is here to testify regarding instruction that he gave on the dates in question. That's a limited purpose of his testimony, is what he instructed upon.

Issues such as self-defense or use of force, the court, at the end of the trial if appropriate, will give you detailed instructions on those subjects. So do not consider this evidence other than the limited purpose for which it is being admitted, and that was what the instruction was.

As the State continued its questioning of the instructor, he testified that "[y]ou should do everything that you possibly can to not get involved in a situation where you would be put in a position where you have to use deadly force" and that "[i]f you can avoid the threat, if you see something that is a potential threat, then you should avoid it." Defense counsel objected that this testimony was not Idaho law. The objection was as follows: "Judge, I'm going to object at this point. That is not Idaho law. And so that is—I am going to object here. Idaho does not have any such requirement, and [the instructor's] testimony would seem to indicate otherwise." The district court overruled the objection and reminded the jury of the limiting instruction. The court stated: "And let's try and go with a question and answer rather than a narrative. I'll overrule at this point again with that limiting instruction. The court is going to give you instructions as to the law regarding, again, appropriate self-defense."

On appeal, Rob argues that the instructor's testimony was not relevant, but lack of relevancy was not included in the two objections made. In arguing that the instructor's testimony was not relevant, Rob does state that Idaho Code section 18-4009(1) "does not require

that a defendant be motivated solely by an objectively reasonable fear or have any fear at all." This is apparently referring to the instructor's testimony regarding the AOJ triad. However, as explained above, there was no evidence supporting the giving of an instruction based upon that code section. Rob does not assert or present any argument explaining how the instructor's testimony regarding the AOJ triad would be inconsistent with the court's jury instruction on self-defense. "Absent any showing that the ruling affected any substantial rights, we will not address whether or not the ruling was correct." *Tapadeera, LLC v. Knowlton*, 153 Idaho 182, 189, 280 P.3d 685, 692 (2012).

Rob also states that the instructor's teaching contradicted Idaho law regarding the duty to flee. The district court correctly instructed the jury that there was no duty to flee.[5] The instruction was as follows:

> In the exercise of the right of self-defense, one need not retreat. One may stand one's ground and defend oneself by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge. This law applies even though the person being attacked might more easily have gained safety by flight or by withdrawing from the scene.

In addition, once the jury was selected and sworn to try the case, the district court read them some preliminary instructions. Those instructions included one telling them that they must accept the law as set forth in the jury instructions. The relevant portion was as follows:

> Your duties are to determine the facts, to apply the law set forth in my instructions to those facts, and in this way to decide the case. In so doing, you must follow my instructions regardless of your own opinion of what the law is or should be, or what either side may state the law to be. You must consider them as a whole, not picking out one and disregarding others.

After all of the evidence had been presented, the district court again instructed the jury that the applicable rules of law were set forth in the jury instructions. The court instructions included the following:

> You have been instructed as to all the rules of law that may be necessary for you to reach a verdict. Whether some of the instructions will apply will

---

[5] The right of self-defense does not require that the person avoid the attack if he can safely do so or do everything in his power to avoid the necessity of acting in self-defense. *State v. Dunlap*, 40 Idaho 630, 637, 235 P. 432, 434 (1925); *State v. McGreevey*, 17 Idaho 453, 467, 105 P. 1047, 1051 (1909).

21

depend upon your determination of the facts. You will disregard any instruction which applies to a state of facts which you determine does not exist.

"We must presume that the jury followed the jury instructions in arriving at their verdict." *Weinstein v. Prudential Prop. & Cas. Ins. Co.*, 149 Idaho 299, 335, 233 P.3d 1221, 1257 (2010).

Rob contends that a jury question showed that the jury did not follow the district court's instructions. During the State's questioning of the instructor, he was asked whether "you make any recommendations with regard to carrying a firearm in a holster or some other carrying device." There was no objection to that question, and the instructor answered: "Any firearm should always be carried in some type of holster. The holster should be a good, sturdy holster, and it should cover the trigger guard on the firearm." The court did not instruct the jury regarding whether a firearm should be carried in a holster, nor did the defense request an instruction regarding that matter. During the jury's deliberations, the jury sent a question to the district court about whether Idaho law required firearms to be carried in a holster. The question was as follows: "We would like clarification regarding the concealed weapon law. Does the law state how the weapon is to be carried when on a person, such as holstered versus not holstered?" After consulting with counsel, the court answered the question, "No, the law does not require a weapon to be holstered." The jury's question does not indicate that the jury disregarded the court's instructions.

# V.
## Conclusion.

We affirm the judgment of the district court.

Chief Justice J. JONES and Justices BURDICK, W. JONES and HORTON **CONCUR.**