**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 48470**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, May 2022 Term |
| | ) | |
| v. | ) | Opinion filed: August 23, 2022 |
| | ) | |
| RICKY EUGENE WEAVER, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Elmore County. James S. Cawthon, District Judge.

The judgment of the district court is affirmed.

Eric Don Fredericksen, State Appellate Public Defender, Boise, for Appellant. Garth McCarty argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. John McKinney argued.

_____

MOELLER, Justice.

Ricky Eugene Weaver appeals his conviction for solicitation of murder. The State maintains that Weaver offered to pay a fellow inmate to murder his girlfriend while they were both being held in the Elmore County Detention Center. Weaver was subsequently charged and convicted by a jury. During his trial, Weaver attempted to elicit testimony from another prisoner, Michael Dean, that Wallace had told Dean that he made up the murder-for-hire story against Weaver in an attempt to try to get a "deal" from the prosecutor in his own case. The district court excluded the evidence on the grounds that Dean's testimony was hearsay and inherently unreliable based on Dean's own statements.

On appeal, Weaver asserts the district court erred by excluding Dean's testimony because the anticipated testimony: (1) was relevant because it tended to make it more probable that Wallace had not testified truthfully but instead had tried to set Weaver up in order to secure a "deal" from

1

the prosecutor; (2) fit within the "state of mind" exception to the hearsay rule; (3) was proper impeachment of Wallace's credibility; and (4) had probative value not outweighed by the possibility of unfair prejudice. For the reasons explained below, we affirm the district court.

## I. FACTS AND BACKGROUND

Weaver was arrested in Elmore County on November 28, 2018, pursuant to an arrest warrant issued out of Owyhee County for domestic violence against his former girlfriend, M.K.[1] After the arrest, he was held in the Elmore County Detention Center for approximately 20 hours before being transported to the Owyhee County Jail. While in the Elmore County Detention Center, on November 29, 2018, the State maintains Weaver offered to pay another prisoner, Michael Wallace, to kill M.K. The State charged Weaver with solicitation of murder in violation of Idaho Code sections 18-2001 and 18-4001. A two-day jury trial commenced on March 5, 2020. The jury found Weaver guilty.

Weaver and M.K. have a daughter together. Weaver also has a daughter, A.W., from an earlier relationship with a woman who will be referred to only by her initials S.H. At trial, M.K. testified that Weaver "told me if he ever lost custody of A.W., he would have me killed." M.K. testified Weaver was worried that his domestic abuse charge against M.K. could give S.H. reason to take custody of A.W. from him. M.K. further testified that Weaver now blamed M.K. for jeopardizing his custody of A.W. since she was the one who reported him for the charge that led to his arrest.

The State's theory of the case is largely founded on Wallace's version of events. Weaver and Wallace were briefly held in the same pod at the Elmore County Detention Center in November 2018. Wallace testified that he heard Weaver "talking to another guy that was in the detention center, Carney, and Carney had made a reaction then, and that's when Carney had came [sic] up to me, and I was like [']What's so funny?['] And that's when he introduced me to Mr. Weaver because he had talked about --." Wallace was interrupted by a sustained hearsay objection. Wallace was next asked "did Mr. Weaver ask you to do anything inappropriate?" He responded: "Yes." When asked "And what did Mr. Weaver ask you to do?", he responded: "He had asked me to murder his -- I don't know if it's his wife or the mother of his child." Wallace later testified that Weaver then offered Wallace $2000, with $200 to be paid upfront, to murder M.K. Wallace testified that Weaver "said he wanted to make it look like – if I could possibly make it look like a

[1] Initials will be used to protect the privacy of certain parties.

2

car accident. And he did say that he didn't want the child hurt." Wallace also testified that Weaver had mentioned "a 1992 white Honda Accord" and that Weaver owned the car, but his girlfriend [M.K.] drove it. Wallace testified he had told Weaver that he had a brother in Chicago, implying that he could get the job done.

Wallace then told the jury that Weaver gave him instructions on how to find his girlfriend. Wallace testified that "first, initially [Weaver] had wrote [sic] some stuff down but he didn't want [it in] his handwriting, so that's when he had me write [the map] down in my handwriting with a pen and a piece of paper in his cell." Wallace testified that Weaver then flushed the paper on which Weaver had initially written down the toilet. The napkin with the map drawn by Wallace was admitted as evidence at trial. Wallace stated that within an hour of their conversation, he sent a "kite"[2] requesting to talk with one of the deputies because he had "information about a young lady whose life may be at harm." Wallace did not think the detectives took him seriously the first time since he did not immediately get a response, so he sent a second kite the next day, when Weaver was transferred to Owyhee County. Wallace testified that when he eventually talked with a detective, "I told him exactly what had happened and there was no deal involved. I just was concerned about this young lady." Wallace requested a deal "when the detectives asked me to do a written statement." Wallace was originally charged with burglary for breaking a car window, but the deal was that he would "get a misdemeanor and then go to court and get time served." Wallace did receive his "deal"; he pleaded guilty to a misdemeanor, rather than the felony. However, he later testified he believed he did not receive what he anticipated because he had spent more time in jail "than what the deal—what the deal—what the plea arrangement was." Detective Parlin testified, confirming that he spoke with Wallace regarding Weaver on November 29, 2018, and December 19, 2018.

In addition to Wallace's testimony, the State's theory of the case was supported by multiple other witnesses, including other Elmore County Detention Center inmates and an Owyhee County Jail inmate. John Myers, an inmate in the Elmore County Detention Center, was held in the same pod with Weaver. He testified to hearing Weaver threaten M.K. and told the jury that he heard Weaver and Wallace discussing "hiring someone to hit -- you know, off his wife or girlfriend." Myers further testified he saw *both* Wallace and Weaver writing on a napkin and that he did not overhear any discussion of a vehicle.

_____

[2] As used here, a "kite" is prison slang for a written request made to correctional personnel.

James Carney was another inmate held in the same pod as Weaver in the Elmore County Detention Center. He testified that he and Weaver had a conversation in which Weaver "said that he was interested in finding somebody to put a hit on his girlfriend." Richard Cage, also called as a witness by the defense, testified that, while he was in Elmore County Detention Center, he overheard Weaver on the phone saying "something about a bitch." Cage did not know who Weaver was talking about, but he testified that he heard Weaver saying that he wished that person were dead. Willie Rabey, an inmate housed with Weaver in the Owyhee County Jail, testified that Weaver "was talking about when he was in Elmore County, he had talked to another inmate about murdering his ex."

Weaver's ex-wife, S.H., testified that on June 19, 2018, Weaver had called her. She recounted their conversation as follows: "[He] asked if I knew anybody who would crack [M.K]'s F'ing skull. I said, 'No.' He asked if I would do it. I absolutely said, 'No.' Offered to pay me. Offered to pay me two more times during this conversation to do so." Additionally, S.H.'s fiancé, D.G., corroborated S.H.'s testimony by testifying that he overheard this conversation between Weaver and S.H. because S.H. had put the phone call on speakerphone and asked him to listen to the call.

On March 4, 2020, the day before trial, the State filed a motion in limine and supporting memorandum to exclude the testimony of Michael Dean, a witness disclosed by the defense. The State argued that Dean's testimony should not be admitted because it was hearsay and because Dean had not been disclosed as a witness until just two days before trial, in violation of the district court's pretrial order. On March 5, after the trial commenced, the issue of whether to admit Dean's testimony was taken up by the district court outside the presence of the jury. The district court acknowledged the State's objection to Dean's testimony but deferred ruling, noting:

> It's difficult for the Court to make any particular rulings on that at this time, inasmuch as I would anticipate that [the State's] witness will testify before [the defense's], some of what comes in that would qualify as impeachment or not impeachment. And all that would depend on the nature of your cross-examination of this individual.
>
> And so it's difficult to make a ruling one way or the other at this time.

On March 6, after the State rested its case, the defense called Dean to testify. Because of the State's pending motion in limine regarding Dean, the motion was again discussed outside the presence of the jury. The State argued that Dean's testimony should be excluded based on the late disclosure and because of the rule against hearsay. The defense argued that Dean's testimony,

4

although admittedly hearsay, was permitted under the "state of mind" exception to the hearsay rule found in Idaho Rule of Evidence 803(3). The State disagreed, arguing that the alleged conversation between Dean and Wallace occurred in February 2019—two to three months *after* Weaver and Wallace's conversation—and, thus, did not qualify for the "*then-existing* state of mind" exception. The district court granted the State's motion in limine and barred Dean's testimony. The district court concluded that although there was no issue of late disclosure, Dean's testimony was not "credible or trustworthy," did not qualify under Rule 803(3), was likely irrelevant, was "of very limited probative value," and was "potentially highly prejudicial." Nevertheless, the district court permitted Weaver to make an offer of proof by allowing Dean to proffer his intended testimony outside the presence of the jury.

Dean testified that he had spoken with Wallace in or around February 2019. Initially, Dean was unable to accurately recall the year this conversation took place, stating that the conversation took place in February or March of 2018 (eight months before Weaver was arrested and the conversation with Wallace occurred). Dean testified that Wallace told him that he and John Myers, another inmate, "got a map from Mr. Weaver with a car and the area where they could pick up the car." Dean stated that Wallace said they were to go and repossess the car. He further explained that "they said they destroyed that map that [Weaver] gave them and they made a new one with [M.K.'s] name and her age, and they was [sic] going to turn it into the DA to try to get a deal. This map was going to be like for a hire to murder [sic]." Dean stated, "I'm thinking that he was going to -- that they hadn't attempted to do it yet. *They haven't attempted to turn the map in yet, that they were going to.*" (Emphasis added). When asked what Wallace said about the murder-for-hire story, Dean testified that "[H]e didn't really elaborate. You know, I sat there, I listened to this plan, and then I just, you know, I immediately just -- I moved. I got – you know, I didn't want to hear anymore." The State asked Dean, "So it's your knowledge of [Weaver's] character traits that make you think he's being framed?" And he responded, "Yes." Importantly, however, when asked why he had not tried to contact the police about this conversation he had with Wallace, Dean testified, "It's none of my business, and, who knows, it probably wasn't -- *it probably ain't* [sic] *true anyways.*" (Emphasis added). Upon hearing this proffered testimony, the district court granted the motion in limine, barring Dean from testifying to the jury.

Weaver's mother then testified for Weaver. She told the jury that while Weaver was in jail, he said, "Mom, will you go get the little white Honda and pick it up for me?" She stated that she

sought the help of the police to recover the car, but they did not help. His mother further testified she later purchased the car from Weaver after he was transferred to the Owyhee County Jail and was able to regain possession of the car. No other testimony was offered by Weaver to corroborate his narrative that the discussions he had with Wallace were simply about recovering possession of the car, rather than about murdering M.K.

Weaver then testified in his own defense, maintaining that he had not solicited Wallace to kill M.K. Weaver explained, "I was upset because [M.K.] had stole [sic] my car against my will."

At the conclusion of the trial, the jury returned a guilty verdict. Weaver then sought, and was granted, leave to discharge his trial attorney and represent himself.[3] Weaver was later sentenced to a 15-year unified sentence, with the first ten years fixed and the next five years indeterminate. Weaver received credit for the 677 days in custody he had already served. Weaver then appealed to this Court.

## II.  STANDARDS OF REVIEW

"The question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion." *State v. Sanchez*, 165 Idaho 563, 572, 448 P.3d 991, 1000 (2019) (quoting *State v. Hall*, 163 Idaho 744, 781, 419 P.3d 1042, 1079 (2018)). "A trial court's decision to admit or exclude hearsay evidence will not be overturned absent a clear showing of abuse of discretion." *Burgess v. Salmon River Canal Co., Ltd.*, 127 Idaho 565, 574, 903 P.2d 730, 739 (1995). When reviewing a district court's decision for an abuse of discretion, this Court considers "whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

## III.  ANALYSIS

Weaver asserts that the district court erred when it excluded Dean's testimony. Weaver claims that (1) the testimony fit within the "state of mind" exception to the hearsay rule; (2) the testimony was proper impeachment of Wallace's credibility; (3) the testimony was relevant because it had a tendency to make it more probable that Wallace had not testified truthfully but

---

[3] On June 22, 2020, the district court granted a motion from Weaver's court-appointed attorney to withdraw at Weaver's request. The court permitted Weaver to represent himself. On June 29, 2020, the court heard Weaver's motion for a new trial, motion for ineffective assistance of counsel, and motion to continue the sentencing hearing. All of Weaver's motions were denied.

instead had tried to set Weaver up in order to secure a "deal" from the prosecutor; and (4) the probative value of the testimony was not outweighed by the possibility of unfair prejudice. We will address the dispositive argument first.

**A. The district court did not abuse its discretion by granting the State's motion in limine because Dean's proffered testimony did not fit within the "state of mind" exception to the hearsay rule.**

"Hearsay is not admissible" unless it qualifies for an exception to the rule against hearsay. I.R.E. 802. Weaver asserts that Dean's anticipated testimony qualifies for the "state of mind" exception to the hearsay rule set forth in Idaho Rule of Evidence 803(3) because it was "Mr. Wallace's own statements about his then existing intent to report Mr. Weaver's conversation about vehicle repossession as a solicitation of murder, in order to obtain a favorable result in Mr. Wallace's own pending criminal case." The State argued that Rule 803(3) does not apply because Dean's proffered testimony was not a statement of Wallace's "then-existing state of mind"; rather it was a "statement of memory or belief to prove the fact remembered," which is expressly excluded under the exception in Rule 803(3). Weaver counters that "Dean's expected testimony was that he understood Mr. Wallace to be telling Mr. Dean about a then-existing plan and how it could be executed."

Idaho Rule of Evidence 803(3) sets forth the "then-existing state of mind" exception to the general prohibition against the admission of hearsay:

> The following are not excluded by the rule against hearsay . . .
>
> . . .
>
> (3) **Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Just a few Idaho cases discuss Rule 803(3); the majority of those that do only review the applicability of hearsay statements related to a party's or victim's state of mind. *See, e.g., State v. Hall*, 161 Idaho 413, 387 P.3d 81 (2016) (defense sought to enter victim's Facebook posts under 803(3) to show intent and that he was the aggressor). This case differs as Weaver seeks to utilize Rule 803(3) to allow a witness (Dean) to testify about another witness's (Wallace) state of mind. Although no Idaho cases have directly discussed the "then-existing" aspect of the state of mind exception, the Ninth Circuit has interpreted the identical provisions of Federal Rule of Evidence

7

803(3) as follows: "Statements of intent to perform a future act are admissible 'state of mind" testimony under Rule 803(3). *United States v. Bishop*, 291 F.3d 1100, 1110 (9th Cir. 2002). Weaver has cited no authority for applying the state of mind exception—under either the federal or Idaho versions of Rule 803(3)—to hearsay statements regarding past events.

After fully considering the arguments of both sides, and later permitting the defense to make an offer of proof regarding Dean's testimony, the district court excluded Dean's testimony. The court explained its reasons as follows:

> . . . It seems from what the Court has heard that what Mr. Dean has to say is that the statements relate to that Mr. Wallace had a way of getting a deal from the district attorney. . . .
>
> That's not anything that's at issue in this particular case. I think it's pretty clear that while it was not brought up in the first interview, it was certainly something that prior to when this conversation would have occurred, that Mr. Wallace pursued, he did receive some benefit, although not necessarily -- it's probably safe to summarize that Mr. Wallace feels jilted somewhat in the deal he got in terms of the time he had to serve.
>
> The other bit of information that he seems to be able to testify about is that this map -- and it's very hard to determine from his testimony whether he was told that they got a map from Mr. Weaver. It seems to be his testimony is -- and like I said, it's hard to track -- got a map to repossess a car, and then maybe made up a new map that he didn't know that they were actually going to turn it in.
>
> It's difficult to decipher. And it -- much of what his testimony involves is sometimes what seems like at least triple hearsay. It's [sic] statements that he was told by Wallace who Wallace was claiming he was told by Weaver that Weaver heard from another person. It's very difficult to decipher what exactly his story is in that regard.
>
> And even assuming -- anyway, I just -- that is very problematic. And more to the point, from the Court's perspective, there is no discussion. In fact, he says he didn't elaborate on the murder-for-hire story.
>
> Mr. Dean is motivated to say that Mr. Weaver is framed because of his fond feelings for Mr. Weaver, that from his perspective Mr. Weaver is a good man, and because of that, he feels like he's being framed. It's not based on any specific statements.
>
> And I would also point out that even if there were specific statements, they may not necessarily be relevant statements concerning the state of mind. There certainly aren't any statements relating to framing Mr. Weaver. And this discussion about the map comes up at a time when not only was the map turned over to law enforcement already, but this case would have been pending for a month or two in the district court at that time.
>
> . . .

Mr. Dean's testimony as to the actual statements he seems to recall from Mr. Wallace in the first instance as to getting a deal, like I said, I don't know that that's even particularly relevant. And its's certainly something Mr. Wallace testified to. Certainly wouldn't be used to impeach him.

The alleged conversation between Dean and Wallace took place in or around February 2019. By this time Wallace had already spoken to law enforcement about Weaver's attempt to hire him to kill M.K. back in November 2018. Therefore, any statements Wallace may have made to Dean in February of 2019 about a plan to frame Weaver and seek a deal were regarding a past plan already put into action. Although Weaver argues that *Dean believed* Wallace was talking about a future plan, whether Dean believed Wallace to be telling him of a future plan or a past plan already executed is not the relevant consideration. To qualify for the exception, the hearsay statements being offered must pertain to the *declarant's* then-existing state of mind. As used in Rule 803(3), the declarant is the person "who made the statement" the proponent of the evidence is seeking to enter into evidence, not the listener. I.R.E. 801(b).

Based on the undisputed facts in the record, Wallace (the declarant) could not possibly have been speaking of his then-existing state of mind regarding his "intent to perform a future act." *Bishop*, 291 F.3d at 1110. Instead, assuming *arguendo* that the conversation even occurred, Wallace would have been speaking of a memory of an already-executed, past plan, which Rule 803(3) expressly deems inadmissible. To avoid this outcome, Weaver argues that because Wallace had not yet received the benefit of his bargain with the prosecutor, the plan was still pending. However, whether Wallace's alleged plan had ultimately worked out for him is immaterial. What matters is that Wallace's alleged plan was completed in November and December 2018 when he turned over the map and spoke with law enforcement. Thus, any discussion between Wallace and Dean about Wallace's scheme to concoct a false murder-for-hire narrative, even if told in the future tense (as Weaver suggests), would have been a discussion from memory of something Wallace had already done.

Accordingly, we conclude that the district court did not abuse its discretion when it determined that Dean's testimony was inadmissible hearsay and that it was inherently unreliable, especially in light of Dean's own admission that the story he had heard "probably ain't [sic] true anyway." This casts substantial doubt on the appropriateness of Dean's testimony, which the district court properly took into account in exercising its discretion to disallow the testimony.

9

Therefore, we conclude there was no abuse of discretion and affirm the district court's decision excluding Dean's testimony.

### B. The parties' additional arguments need not be addressed by this Court.

Because Dean's proposed testimony is inadmissible under the hearsay exception contained in Rule 803(3), and inherently unreliable based on Dean's own statements, we need not address Weaver's remaining arguments regarding the relevance of the testimony, its probative value, and its suitability as impeachment evidence. Based on our analysis set forth above, the evidence would not be admissible for any of the alternate reasons Weaver suggests. Accordingly, we need not address the State's harmless error argument because we have found no error in the district court's evidentiary ruling.

### IV. CONCLUSION

For the foregoing reasons, we affirm the district court's decision to exclude Dean's testimony.

Chief Justice BEVAN, Justices BRODY, STEGNER and ZAHN **CONCUR.**